**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Emanuel BARSHOV and James E.
Ross, Defendants-Appellants.**

No. 83–5158.

United States Court of Appeals,
Eleventh Circuit.

June 4, 1984.

Rehearing Denied July 9
and July 10, 1984.

Michael Tarre, Coral Gables, Fla., for Barshov.

Culverhouse, Botts, Mills & Cone, Hugh F. Culverhouse, Jr., Nathan D. Clark, Miami, Fla., for Ross.

Glenn L. Archer, Michael L. Paup, Chief Appellate Sec., Deborah Dawson, Robert E. Lindsay, Tax Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT and HENDERSON, Circuit Judges.

ALBERT J. HENDERSON, Circuit Judge:

Emanuel Barshov and James E. Ross were convicted in the United States District

Court for the Southern District of Florida on one count of conspiracy and twenty-three substantive counts for violations of the tax laws of the United States.[1]

PAN Properties, Ltd. ("PAN") and NAP Properties, Ltd. ("NAP") were limited partnerships formed in 1973 under the laws of Florida by Barshov and Ross, who were the general partners. Both PAN and NAP attracted a number of limited partners, each of whom was an investor in the partnerships.[2] The stated purpose of these limited partnerships was to buy motion pictures for distribution and exhibition. To that end, PAN and NAP each bought four movies and, of the total purchase price, paid a small percentage in cash and secured the remainder with "non-recourse" promissory notes.[3]

The criminal charges stem from the manner in which the financial arrangements for these purchases were subsequently reported to the Internal Revenue Service ("IRS"). Each partnership, and hence each partner, was entitled to certain depreciation deductions and investment tax credits in conjunction with the movie purchases. Such deductions and credits are determined by the basis, or cost, of each movie, and the ratio of its actual revenue in any one year over its projected lifetime revenue. The govern-ment claims that Barshov and Ross knowingly purchased the movies at tremendously inflated prices and, therefore, knowingly raised the basis for depreciation and investment credit purposes. Additionally, the government charges that the income forecast method of depreciation[4] was fraudulently manipulated by the defendants when they falsified the actual revenue and projected revenue. The basis for the indictment is the fact that deduction and tax credits were arrived at by fraud and were reflected on the partnership returns for PAN and NAP, the individual returns for Barshov and Ross, and the individual returns of the limited partners.

On appeal, Barshov and Ross allege that (1) the evidence was not sufficient to support the jury's verdicts, (2) prosecutorial misconduct deprived them of a fair trial, (3) the district court erred in its disposition of pretrial motions, (4) certain testimony was improperly admitted, (5) the district court failed to conduct an evidentiary hearing into allegations of jury misconduct, (6) the district court's supplemental instructions to the jury were coercive, and (7) the cumulative effect of these alleged errors compels a new trial. We have examined these assignments of error after a thorough review

1. Count I charges Barshov and Ross with conspiracy to impede, disrupt and defeat the Internal Revenue Service in the computation and collection of tax revenue. 18 U.S.C. 371.

    In Counts II and III Ross alone is accused of making individual tax returns (Forms 1040) for 1974 and 1975 which were not true and correct. 26 U.S.C. 7206(1).

    Counts IV and V charge Barshov with similar offenses for 1974 and 1975. 26 U.S.C. 7206(1).

    In Counts VI and IX Ross is indicted for making false partnership returns (Form 1065) for 1974 on behalf of two partnerships. 26 U.S.C. 7206(1).

    Counts VII and X allege that Barshov willfully aided and assisted in the preparation of the same false partnership returns for 1974. 26 U.S.C. 7206(2).

    Counts VIII and XI accuse Barshov and Ross of wilfully making false partnership returns for 1975. 26 U.S.C. 7206(1).

    In Counts XII through XXIV Barshov and Ross are charged with aiding and assisting in the preparation of thirteen false individual tax returns filed by others. 26 U.S.C. 7206(2).

2. A limited partner's liability is limited to the amount of his investment, while a general partner's liability is unrestricted.

3. The indictment alleged that during 1973 and 1974, Barshov and Ross, on behalf of PAN, made payments totalling approximately $290,000.00 and executed promissory notes without personal recourse (non-recourse) to the seller in the sum of $2,600,000.00. During that same period they made payments totalling approximately $289,000.00 and executed non-recourse notes in the sum of $2,250,000.00 for NAP.

4. The income forecast method of depreciation is computed by multiplying the tax basis by a fraction, the numerator of which is the income earned by a film for the tax year and the denominator of which is the numerator figure plus the reasonable estimated future income to be earned by the film for its life expectancy. If a film does not produce any income for a given year, the numerator of the fraction would be zero, and no depreciation could be claimed for that year.

of the record and applicable law and, finding no deficiencies resulting in prejudice to the appellants, we affirm the convictions.

## I.

During the trial, the defendants moved for judgments of acquittal, claiming that their "hypothesis of innocence" was sufficiently strong and reasonable to create a reasonable doubt as to their guilt. They contend that the evidence supported their theory of defense to a greater extent than it did the government's inference of guilt.

■ The proper standard of review for sufficiency of evidence was articulated in *United States v. Bell*, 678 F.2d 547 (5th Cir.1982) (*en banc*), *aff'd* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983):

It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

678 F.2d at 549.[5] The evidence presented and the inferences that may be drawn therefrom must be viewed on appeal in the light most favorable to the government. *Id., citing Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942).

■ Adhering to these guidelines, we conclude that the evidence presented by the government was sufficient to support the jury verdict. The thrust of the government's proof was the criminal design to inflate the purchase price of the films and the income therefrom in order to maximize the depreciation costs and the investment credit. Although the appellants offer several innocent "explanations" to rebut the evidence, none of them are so persuasive that they could not have reasonably been rejected by the jury. Simply stated, the jury was confronted with evidence which clearly established a pattern of guilt, and there was additional evidence from which they could reasonably conclude that the incriminating evidence arose not coincidentally or accidentally, but intentionally and purposefully. Taking the evidence as a whole, it was more than enough to sustain the verdicts of guilt.

## II.

Barshov and Ross call attention to three instances of alleged prosecutorial misconduct which they claim deprived them of a fair trial. They first complain that the prosecutor, in closing argument, referred to a 94 percent depreciation limitation on the accumulated depreciation deduction allowable for PAN. They say that the 94 percent figure was incorrect, and that any reference to civil regulations relating to depreciation was improper in drawing inferences of criminal conduct.

■ In the context in which the 94 percent figure was mentioned, it makes no difference whether the proper statutory limit was 94 percent or 96 percent as contended by Barshov and Ross. Reference to the 94 percent figure came as the government quoted an opinion letter utilized by the appellants in the furtherance of their enterprise. The reference was intended to serve the purpose of explaining why films were depreciated at a constant rate, and it was the consistency of depreciation, not the rate figure, which was crucial. Thus, any error in the percentage rate was of no consequence.

■ In asserting the impropriety of arguing the violation of civil regulations to impute criminal conduct, Ross cites *United States v. Frade*, 709 F.2d 1387, 1392 (11th Cir.1983), in which this court held that "crimes are not to be created by inferences from the combination of civil statutes and government disapproval." He says that the mention of the depreciation limitation

---

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

created prejudicial inferences when combined with the statement of the prosecutor that partnership losses had been disallowed by the IRS.

If the evidence had been confined to that cited in these statements, it would not have been sufficient to sustain a finding of guilt because the statutes also require proof of intent to defraud. However, this is not a case in which the government attempted to prove a crime simply by proving a violation of civil law or regulations. There was ample evidence of the appellants' conduct to establish the necessary scienter.[6]

■ The appellants also fault the government attorney's cross-examination of them with respect to their income from the partnerships and the amount of their tax liability. This evidence was directly relevant to the offenses charged to establish motive and to rebut one aspect of their defense. Evidence of the appellants' considerable income from the partnerships and their use of partnership "losses" to eliminate their tax liability goes to the motive of establishing tax-free profits and was directly connected to the alleged conspiracy. The cross-examination was also necessary to rebut their defense that they wanted the partnerships' films to be successful.

■ The third claim of prosecutorial misconduct stems from a comment made by the prosecutor in his closing argument respecting the testimony of the partnerships' attorney, Oliver Murray, that certain deductions he had made on his tax return in connection with another limited partnership had been disallowed by the IRS. In summation, the prosecutor said:

Now, add up the circumstances. Purpose—to create a fraud, and that is what they did. They perpetrated a fraud against the United States. That is what they conspired to do and got caught.

*These losses have been disallowed, as Mr. Murray said, and the other people have said, and now the question is, did they do it with intent to defraud?* [Emphasis added.]

The appellants argue that the reference to the disallowed deductions implied that the IRS had already decided what the jury itself was being asked to determine—that is, whether the appellants intended to defraud the government.

There was no error in referring to Murray's testimony. However, the reference to what "other people" had said was improper, because there was no evidence to substantiate it. The essential question, then, is whether this statement was harmless.

Examining the remark in the context of the entire record, we do not find that any substantial prejudice accrued to the appellants. First, there was evidence—Murray's testimony—to support the essential thrust of the prosecutor's claim. Second, the error was cured by the district court's instructions to the jurors that they must consider only the evidence in the case, and that the lawyers' statements and arguments were not evidence. Hence, any error was harmless.

### III.

Before the trial began, the appellants sought access to the 1973, 1974 and 1975 tax returns of Samuel Lang, a key witness for the government, under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). On May 20, 1982, the magistrate ordered the government to disclose to the appellants the relevant portions of Lang's individual tax returns for the tax years in issue, as well as any agreements between the government and Lang regarding his tax returns or possible prosecution.[7]

---

**6.** Moreover, the prosecutor explicitly stated that the issue of guilt was for the jury to determine: "[N]ow the question is, did they do it with intent to defraud?"

**7.** The order specified that:
[I]n the event that the Government intends to call Samuel Lang as a witness, the Govern-

ment disclose to the defendant pursuant to Title 26, U.S.Code, Section 6103(h)(4).
1. Those portions of the individual tax returns of Samuel Lang for the taxable year 1973 through and including 1975 which refer to or pertain to PAN LTD and/or any other business enterprise, venture or tax

The government responded that it had no such materials and information. However, on June 14, 1982, the government disclosed to defense counsel that Lang had not filed income tax returns since 1972. The government also gave defense counsel transcripts of an audit of Lang's tax liability for 1972 through 1974.

On September 3, 1982, Ross filed a motion to dismiss, alleging that the government had intentionally suppressed critical impeachment evidence in not revealing Lang's failure to file returns for ten years. In the alternative, Ross asked that the court fashion a procedure so that he would be assured of receiving tax "return information" about Lang, which included a request that the court inspect *in camera* all available tax "return information" in order to insure the government's compliance with the court's *Brady* orders.

A hearing on Ross's motion was held before the magistrate on September 21, 1982. The magistrate determined that the government had not withheld any *Brady* material but did order that:

> The Government forthwith shall furnish disclosure to the defendants (unless heretofore done so) any and all oral or written agreements, commitments, promises and/or understandings it has with Samuel Lang ... as to any benefits and/or advantages or disadvantages to (him) of whatsoever kind or nature.

The government again stated that it had no such information pertaining to Lang. On September 29, 1983, the district court de-

nied the defendants' pending *Brady* motions.

Seizing on this sequence of events, Ross says that the district court erred in failing to make an *in camera* inspection of Lang's tax return information before ruling on the last *Brady* motion. We disagree.

■ In *Brady*, the Supreme Court set forth the general rule for evaluating the due process implications of a prosecutor's refusal to provide favorable evidence to the defense: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. Subsequent decisions have refined and clarified this decision. To establish a *Brady* violation the defendant must prove (1) the prosecution's suppression of evidence; (2) the favorable character of the suppressed evidence for the defense; and (3) the materiality of the suppressed evidence. *United States v. Sink*, 586 F.2d 1041, 1051 (5th Cir.1978); *United States v. Anderson*, 574 F.2d 1347, 1353 (5th Cir.1978).

■ The record before us does not substantiate the allegation that the government suppressed existing evidence. There is no evidence of the existence of further tax information. Ross merely suggests the possibility of the existence of the information he hoped to uncover. Such speculative allegations do not adequately invoke the rule.[8]

---

shelter as to which the defendant Ross is charged herein; [citations omitted].
2. Any and all agreements, promises, rewards, understandings, settlements and/or understandings between the Government and Samuel Lang pertaining to the processing, examination and/or credits, allowances or liability, civil and/or criminal, of Samuel Lang as to any income tax collections, obligations, approvals, penalties, fines, forfeitures, interest charges and/or prosecutions; [citations omitted].

**8.** Appellants rely on *United States v. Diaz-Munoz*, 632 F.2d 1330 (5th Cir.1980), for the proposition that the district court had a duty to inspect hypothetical "evidence" in order to verify the government's assertions that such evidence did not exist. *Diaz-Munoz* does not support such a general proposition. The error addressed in *Diaz-Munoz* was the district court's reliance on government representations about the relevance of documents which the government admitted to having in its possession, and the court's failure to evaluate the evidence for itself. That case is critically distinguishable from the instant situation, in which the government consistently contended that it had no evidence that established whether or not Lang had an obligation to file tax returns, and that it had no agreement with Lang which might have influenced his testimony.

Moreover, there is no showing of the materiality of any possible suppressed evidence. *Brady* mandates reversal only where, upon examination of the entire record, it appears that "the omitted evidence creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342, 355 (1976). Accord, *United States v. Diaz-Munoz*, 632 F.2d 1330, 1334 (5th Cir.1980). The information relating to Lang's taxes would not have affected the outcome of the trial. There was ample evidence from which the jury could infer Lang's criminal conduct, as well as his compelling selfish interest in testifying for the government. These concessions were adequately developed from the defendants' cross-examination of Lang about his failure to file his tax returns. *See Keating v. Missouri*, 643 F.2d 1315, 1319–20 (8th Cir.), *cert. denied*, 454 U.S. 846, 102 S.Ct. 163, 70 L.Ed.2d 133 (1981) (evidence of an agreement between prosecution and witness not material under *Brady* where defense cross-examination sufficiently called into question witness' credibility).

## IV.

Clayton Pantages, the distributor of "Made", a NAP movie, and "Straight On", a PAN film, testified that reports he prepared for the purpose of making his income forecasts on those films revealed that they generated no income in 1975. He testified, over Ross's objection, that after the completion of the reports, either Ross or Barshov asked him to revise the income for these two movies, and that he subsequently changed the reports, inserting false play dates and false income.[9] Pantages testified that he could not recall which of the defendants called him and made the request.

It is this inability to remember which of the two defendants made the request that forms the basis of Ross's argument that the testimony was inadmissible. Ross relies on *DeLoach v. United States*, 307 F.2d 653, 654–55 (D.C.Cir.1962), in which the trial court erred in admitting certain statements made by an unidentified speaker who was one of several co-defendants for the purpose of binding a single defendant.

The government points out there was no conspiracy charged in *DeLoach* and consequently, there was no element of vicarious liability. In contrast, Barshov and Ross were indicted and convicted on conspiracy charges. A conspirator is charged with the acts of his co-conspirators, if such acts were done in furtherance of the conspiracy. *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489, 1496 (1946). For this reason, the government asserts that it does not matter whether it was Barshov or Ross who asked Pantages to falsify play dates, so long as it was one of the two.

We agree that *DeLoach* is distinguishable from the present case, and that Pantages' testimony was admissible as evidence of an act performed in furtherance of a conspiracy.[10]

Ross submits that even if the government is correct, the district court still erred in admitting the statement because at the time of Pantages' testimony there was not sufficient evidence to establish the conspiracy. He claims that it is error to admit such statements until the government first proves the existence of the conspiracy and the defendant's participation in it beyond a reasonable doubt.

In *United States v. James*, 590 F.2d 575 (5th Cir.) (*en banc*), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the former Fifth Circuit Court of Appeals established the "preferred order of proof" for the admission of co-conspirator statements. Under the *James* standards, the initial admissibility of co-conspirator state-

---

9. The income figures were important components of the depreciation computations. See n. 4 *supra*.

10. Fed.R.Evid. 801(d)(2)(E) provides that a statement is not excludable as hearsay if offered against a party and made "by a co-conspirator of a party during the course of and in furtherance of the conspiracy."

ments depends upon whether the government can produce substantial independent evidence showing that a conspiracy existed between the defendant and the declarant, and that the statements were made during the course of and in furtherance of the conspiracy. *Id.* at 581. Because the district court "normally" should make this threshold determination before the jury hears the challenged statements, *id.*, the procedure by which the district court makes this determination has come to be known as a "*James* hearing."

The *James* court also stated that if the district court concludes that a *James* hearing is not reasonably practical, it can admit the statements subject to the government later "connecting them up" with sufficient independent evidence. *Id.* at 582. In either situation, on appropriate motion, the district court must determine that, by a preponderance of the independent evidence, there was a conspiracy between the defendant and the declarant and the statements were made during and in furtherance of the conspiracy. *Id.*

In the trial of this case, there was no motion made for a *James* hearing when Pantages testified, nor was there a motion at the conclusion of all the evidence. In the absence of such motions, we cannot find error in the failure of the district court to make an explicit determination of the existence of the conspiracy.

There is no contention that, at the conclusion of the case, the evidence did not preponderate in favor of the existence of a conspiracy. In fact, no such assertion could creditably be made because, even excluding Pantages' challenged testimony, there was sufficient evidence to support the finding of a conspiracy. The district court did not err in admitting the evidence.

## V.

▮ Barshov next claims that the trial court committed reversible error by denying a defense motion to examine the jury panel with respect to a prejudicial remark allegedly made during jury selection.

Jury selection for this case was conducted simultaneously with the choosing of panels for two other trials. During the selection process, the prospective jurors gave short recitals of pertinent facts about themselves. The court then introduced the parties and attorneys involved in the three cases, and asked if any of the prospective jurors were related to or acquainted with them in any way. At that point, Barshov's counsel approached the bench and told the judge that counsel in one of the other cases had informed him that when Barshov had stood up one of the prospective jurors stated, "He looks like a crook." The court agreed to investigate the matter during a recess.

After the court, the government attorney and defense counsel had questioned the prospective jurors individually on a number of matters relevant to their qualifications, the jurors were excused and the trial judge inquired into the circumstances surrounding the comment. The lawyer who had overheard the remark repeated it to the court and another person verified the attorney's account, adding that the remark had been accompanied by a "short laugh." Neither witness could positively identify the speaker, but it was believed that the remark had been made by a prospective juror who had made other offhand comments.

Defense counsel requested the court to determine who, in fact, made the remark, and also asked that the entire jury panel be examined to see if the remark had been heard and had had any effect on their ability to sit on the case. The court refused to conduct such an inquiry, stating that he would not assume taint from the remark and that an inquiry might "aggravate the situation." The suspected prospective juror was ultimately excused by Barshov.

We have repeatedly held that the district court is vested with broad discretion in deciding whether to interrogate jurors regarding alleged misconduct. *United States v. Williams,* 716 F.2d 864, 865 (11th Cir.1983); *United States v. Chiantese,* 582 F.2d 974, 978–80 (5th Cir.1978), *cert. de-*

*nied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). After examining the statements of counsel and the court during the hearing outside the presence of the jurors, we conclude that the trial judge acted within his discretion in declining to make further inquiry in this case.

In *Chiantese,* 582 F.2d at 980, we set out the factors which must be considered by the district court:

> In determining whether to conduct a hearing in a case such as this, the court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct.

The district court's disposition of Barshov's motion was well within these parameters of discretion. The court properly made an inquiry during the recess to determine the nature of the alleged misconduct. The court then gave full consideration to the possible effect of the remark on the panel, as well as to the aggravating effect that might result from an examination. The district court is in the best position to make the necessary determinations. Having clothed the court with broad discretion, we will not now attempt to second-guess the evaluation and ultimate holding.

## VI.

The appellants next urge that the district court erred in denying their post-trial motion to interview the jurors who served in the case and the son of juror Phillips because of their suspicion that "extraneous, prejudicial information or outside influence was improperly brought to the jury's attention during trial." They also claim that the court erred in denying Barshov's motion for new trial which alleged that "the jury's verdict may have been affected by extraneous prejudicial information and outside influences from one of the juror's sons."

Simultaneous with the filing of their motion, the appellants submitted affidavits stating that juror Phillips' son had attended the trial every day and overheard discussions occurring outside of the jury's presence; that he was seen talking to jurors during recesses and eating lunch with his mother and other jurors; that he talked to the prosecutor and defense counsel about the case; that he attempted to discuss the case with Barshov; that, when the jury began deliberations, he gave Ross an envelope containing his "decision" in the case; that he told Barshov's wife that people like the Tylenol killers "should be shot"; that, after the jury returned its verdict, he told Barshov's attorney that "we did as well as we could with what we had", and that his mother had trouble hearing some of the testimony and some of counsel's questions.

Barshov argues that the trial court has a duty to investigate when potential conduct which might have influenced the jury's deliberations is brought to its attention, and the failure to conduct a hearing is an abuse of discretion.

Where a colorable showing of extrinsic influence is made, a trial court, in the exercise of its discretion, must make sufficient inquiries or conduct a hearing to determine whether the influence was prejudicial. *United States v. Winkle,* 587 F.2d 705, 714 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). However, there is no *per se* rule requiring an inquiry in every instance. *United States v. Martinez,* 604 F.2d 361, 364 (5th Cir.1979), *cert. denied,* 444 U.S. 1034, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980). The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality. *Winkle,* 587 F.2d at 714. In other words, there must be something more than mere speculation. *United States v. Sedigh,* 658 F.2d 1010, 1014 (5th Cir.1981) *cert. denied,* 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982). We agree with the district court that the appellants made no such colorable showing.

The appellants' affidavits contain no evidence that the jurors and the son of

juror Phillips engaged in any improper discussions. As the district court stated in addressing the appellants' contention:

The fact that jurors were seen in conversation with a spectator over lunch does not give rise to the presumption that they were discussing the case. It is presumed that the jurors followed the court's oft-repeated instructions not to discuss the case with anyone. *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304 (5th Cir. 1977). There is nothing in the affidavits attached to the Defendants' motion which indicates the "improper conveyance of information to the jury." *Id.* at 1310. All parties and the court were aware of Mr. Phillips' presence through the trial and no objection was presented to the court at that time. Further "[t]he trial judge instructed the jury not to discuss or allow anyone else to discuss the case with them. We cannot presume, without an affirmative showing, that the jury failed to follow these instructions. *Id.* at 1310.

Although the pattern of behavior attributed to the juror Phillips' son may be characterized as unusual and peculiar, that in itself does not suffice to mandate further inquiry. In the absence of a colorable showing that the conduct complained of impugned in any way the integrity of the trial process, the district court was not required to make further inquiries or to conduct a hearing, and its refusal to do so did not constitute an abuse of discretion.

## VII.

█ The appellants assert that the court's supplemental instructions had the effect of hurrying and coercing the jurors into reaching a verdict. They recite selective portions from the dialogue between the court and the jury concerning the possibility of weekend deliberations to support their charge that the jurors were led to believe they would have to reach a verdict before the weekend.

In determining whether the district court's supplemental instructions were coercive in this instance, we consider not only the specific instructions, but also the "totality of the circumstances." *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957, 958 (1965).[11]

We have reviewed both the language of the instructions and the dialogue which ensued and find no indicia of coercion. First, there is no indication that verdicts could and would not be reached. *United States v. Blevinal*, 607 F.2d 1124, 1127 (5th Cir. 1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980). Second, the instructions stressed that the jury could have as much time as necessary to reach its verdicts, and that it was not restricted by an arbitrary deadline. *See id.* at 1127. Taken as a whole, the district court's instructions "carefully avoided the pitfalls of coercive deadlines, threats of marathon deliberations, pressure for surrender of conscientiously held minority views, or any implication of a false duty to decide." *United States v. Cheramie*, 520 F.2d 325, 331 (5th Cir.1975).

## VIII.

The appellants finally argue that the cumulative effect of all the "errors and near-errors" during the trial requires reversal of the convictions. Without harmful errors, there can be no cumulative effect compelling reversal.

The judgments of the district court are AFFIRMED.

---

11. Although the "totality of the circumstances" test was fashioned to evaluate the effects of *Allen* charges, it may be used wherever "it is alleged that a supplemental charge coerced the jury in its decision making." *United States v. Cheramie*, 520 F.2d 325, 328 (5th Cir.1975).