JAMES E. ROSS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ross v. Commissioner
Docket Nos. 4176-79; 4178-79; 4179-79; 4346-79; 10557-80.
United States Tax Court
T.C. Memo 1988-283; 1988 Tax Ct. Memo LEXIS 303; 55 T.C.M. (CCH) 1170; T.C.M. (RIA) 88283; June 28, 1988. *303 Held: Petitioners' "new evidence" was available in their prior criminal proceeding and cannot now be relied upon to preclude the application of collateral estoppel. Held further, petitioners' prior convictions under section 7206 and 18 U.S.C. sec. 371 (1982) do not collaterally estop them from denying that they intended to evade taxes in this proceeding for purposes of determining whether the addition to tax for fraud under section 6653(b) is applicable. Nathan D. Clark and Richard Josepher, for the petitioners in docket Nos. 4176-79 and 4346-79. Steven Sonberg, Ursula Mancusi-Ungaro, and Moises T. Grayson, for the petitioners in docket Nos. 4178-79, 4179-79, and 10557-80. Kenneth A. Hochman, Susan Wynne, and Lourdes M. DeSantis, for the respondent. WHITAKER
MEMORANDUM OPINION WHITAKER, Judge: This cause is before the Court on petitioners' Motions for Summary Judgment and respondent's Motions for Partial Summary Judgment (as amended), all of which raise the issue of collateral estoppel. [2] The record with respect to these motions consists of the motions, responses, memorandums and affidavits in support of the motions and responses, and exhibits attached to the memorandums and affidavits. *304 There appearing to be no genuine issue of material fact, a decision may be rendered as a matter of law. Rule 121(b). [3] In his motions Respondent seeks to collaterally estop petitioners James Ross and Emanuel Barshov (hereinafter petitioners) [4] from denying (1) that their 1974 and 1975 Federal income tax returns contained false and fraudulent deductions for losses, which deductions petitioners knew were false when they subscribed and presented those returns to respondent, and (2) that petitioners' income tax returns were filed with false and fraudulent deductions with intent to evade tax. [5] *306 *307 Petitioners, in their motions, which should be entitled Motions for Partial Summary Judgment, seek a decision that they are not collaterally estopped from denying that they intended to evade taxes, the second element of respondent's amended motions. Petitioners also claim, in their *305 responses to respondent's motions, that newly discovered evidence precludes the application of collateral estoppel altogether. [6]
Factual Background
Respondent determined deficiencies and additions to tax in the following amounts: *308 BARSHOV
Year
Tax
6653(b) [7]
6653(a)
6651(a)(1)
1971
$   1,426.00
None    $     71.00
None   1974
300,470.00
$ 150,235.00 * 15,075.65 * $ 75,117.50
1975
197,963.00
98,981.50 *  9,898.00
None   $ 499,859.00
$ 249,216.50
$ 25,044.65
$ 75,117.50
ROSS
Year
Tax
6653(b) [8]
6653(a)
6651(a)(1)
1974
$ 187,079.00
$ 93,539.50 * $ 9,354.00
-0-   1975
159,605.00
79,802.50 * 7,891.00 * $ 7,891.00
1976
16,398.00
820.00
820.00
Petitioners' prior criminal convictions and the claimed deficiencies and additions to tax arise out of their involvement in two limited partnerships, Pan Properties, Ltd. (Pan) and Nap Properties, Ltd. (Nap), both of which were formed to acquire and distribute films. [9] *309 On March 12, 1973, Emanuel Barshov and James Ross, doing business as Pan, entered into an agreement to acquire all of the United States rights in four films from Freedom USA Records, Inc. (Freedom), a company owned by SamuEl Lang. Pursuant to the terms of the agreement, Freedom was to sell the rights in the films for the following amounts: Film
Terms of Payment
"Demons of the Mind:
$ 80,000 cash and a six percent
(6%), twelve-year mortgage in the
amount of $ 720,000
"Straight on 'Til Morning"
$ 90,000 cash and a six percent
(6%) twelve-year mortgage in the
amount $ 810,000
"Fear in the Night"
$ 110,000 cash and a six percent
(6%) twelve-year mortgage in the
amount of $ 990,000
"'Tis a Pity" [10]
$ 70,000 cash and a six percent
(6%), twelve-year mortgage in the
amount of $ 630,000. [11]
On June 28, 1973, (subsequent to the March 1973 agreement, *310 but prior to the execution of an Acquisition Agreement between Freedom and Pan), Freedom acquired all of the right, title, and interest in the first three films from Anglo EMI Film Distributors, Ltd. (EMI). In consideration for these rights, Freedom agreed to pay EMI $ 290,000; $ 90,000 was payable upon execution of the agreement and $ 200,000 was payable by Freedom's execution and delivery of a promissory note in that amount, payable in 10 years. Pursuant to the agreement: all monies received by [Freedom] from the sale, distribution, marketing or other disposition of the Television Rights, Cassette Rights and Non-Theatrical Rights in the Photoplays [12] [would] be paid to EMI until such time as EMI * * * received an amount equal to [$ 200,000]. To secure the $ 200,000 note, Freedom granted EMI, a security interest in and to the television rights, cassette rights, and nontheatrical rights in the films and in and to all of the proceeds derived and to be derived from the film's exploitation through these means, pursuant to the provisions of the Uniform Commercial Code. Freedom also assigned to and pledged with *311 EMI all of its right, title, and interest in and to the films. As an inducement to EMI to enter into the purchase agreement, Freedom also, on June 28, 1973, designated EMI its sole, exclusive sales agent in the United States in regard to the television, cassette, and nontheatrical rights to the films for the period until receipts from distribution to these media equaled $ 200,000, or the amount for which Freedom was obligated to pay EMI. Pursuant to this separate distribution agreement, EMI was to have sole and uncontrolled discretion in the exploitation of the these rights and was to have the right to decide when, where, how, on what basis, and to what extent, if any, they would be exploited. The next day, June 29, 1973, Freedom entered into its "Acquisition Agreement" with Pan. Pursuant to this agreement, Freedom purportedly transferred all right, title, privileges, interest, ownership and claims, etc. it had in all four films to Pan. Freedom also specifically warranted that it had the "sole, full and exclusive right and interest in and to the Pictures and the unrestricted power to enter into and perform [the] Agreement * * *.' The agreement does not mention the separate, earlier *312 executed distribution conservation easement between EMI and Freedom. Pan then entered into a distribution agreement that same day with Cinevision International Films Ltd. (Cinevision), a company owned by Mr. Lang, for all four films. Pursuant to this agreement, Pan granted Cinevision the sole and exclusive right, license, and privilege to distribute the films by any means except as specifically provided. In the agreement, Cinevision expressly acknowledged and agreed that the proceeds of any television or cassette sales of the films (except "'Tis a Pity") were subject to an overriding charge in the amount of $ 200,000, which amount was first to be paid to Pan prior to application of any distribution fees set forth in the agreement. [13] *313 On July 19, 1973, Samuel and Andrea Lang executed the following personal guarantee in favor of Pan with respect to all four films: 2. Euro-International Productions ("Euro) and Anglo EMI Film Distributors Ltd. ("EMI") will agree, on or before September 20, 1973, to defend, indemnify and hold you harmless from and against any and all loss, damage, liability or expense, including reasonable attorney's fees, resulting from any breach or alleged breach of any of the warranties, representations and agreements, including without limitation, their warranties and representations relative to clear title, made by each of them in their respective agreements with Freedom U.S.A. Records, Inc. with respect to the sale of "'Tis A Pity" by Euro and the sale of "Demons of the Mind", "Straight on Till Morning" and "Fear in the Night" by EMI; and 3. The film laboratories at which the preprint materials of the foregoing pictures are located will, on or before August 31, 1973, execute the access letters granting you access to such preprint materials and statements to the effect that such preprint materials are of such quality that first *314 class acceptable release prints may be made therefrom. In the event that all of the events set forth in paragraphs (1), (2) and (3) above shall not have occurred on or before the dates specified above, time being expressly made of the essence, then, and in such event, the undersigned shall, upon your demand, deliver to you a certified check in the amount of $ 290,000. Upon such delivery, the acquisition agreement between you and Freedom U.S.A. Records, Inc. ("Freedom"), dated June 29, 1973, together will all relevant documents and materials executed and/or delivered by you or Freedom shall terminate and be of no further force and effect, without liability to either you or Freedom and the distribution agreement dated June 29, 1973 between you and Cinevision International Films Ltd. shall likewise terminate and be of no further force and effect without liability to any party. Drafts of the indemnification promised in the Langs' personal guarantee were exchanged among counsel for Pan, EMI, and Freedom. The indemnity agreement between EMI and Pan with respect to the films other than "'Tis a Pity" was finally executed sometime after October 31, 1973. [14] It was made effective as of *315 June 29, 1973. The indemnification agreement provided: 2. ACCEPTANCE BY PAN. Indemnitee accepts the assignment of Freedom's ownership interest in the Pictures as more fully set forth in the Acquisition Agreement. Indemnitee acknowledges and recognizes the security interest running to Indemnitor which constitutes a charge on the television, non-theatrical and cassette rights acquired by Indemnitee to the extent of $ 200,000.00, as set forth in the Purchase Agreement, which charge and the payment of which charge are more fully described in the Acquisition Agreement. Indemnitee further acknowledges and confirms its agreement to the provisions of that certain distribution agreement, dated June 28, 1973, between Indemnitor [(EMI)] and Freedom. [15] *316 Up to the time of this transaction, Pan was represented by an attorney named Oliver C. Murray, Jr. Mr. Murray has no recollection of the Indemnity Agreement or of ever having any person reveal to him the existence of the arrangement for distribution of any of the rights of the films between EMI and Freedom. However, correspondence between Mr. Murray and Mr. Lang during this period of representation refers to the Indemnification Agreement. In 1981, petitioners were indicted in criminal proceedings in the United States District Court for the Southern District of Florida with respect to their involvement in the Pan and Nap limited partnership. *317 Count I of the indictment charged petitioners with conspiracy to defraud the United States, by impeding, impairing, disrupting and defeating the lawful Governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of the revenue, in violation of 18 U.S.C. sec. 371 (1982). Counts II, III, IV, and V charged petitioners with wilfully making and subscribing to their Federal income tax returns for the years 1974 and 1975 although they did not believe the returns were true and correct as to every material matter, in violation of section 7206(1). Counts VI, VIII, IX, and XI charged petitioners with wilfully making and subscribing partnership returns, Forms 1065, for Pan Properties, Ltd. and Nap Properties, Ltd. for the taxable years 1974 and 1975, which they did not believe to be true and correct as to every material matter in violation of section 7206(1). [16] *318 Counts XII-XXIV charged petitioners with willfully aiding, assisting, and advising in the preparation of false and fraudulent individual income tax returns of investors in partnerships for the years 1974 and 1975 in violation of section 7206(2). On January 7, 1983, after a jury trial, petitioners were convicted on all counts as charged in the indictment. [17] *319 See United States v. Barshov,733 F.2d 842 (11th Cir. 1984), cert. denied 469 U.S. 1168 (1985). The judgments of the United States District Court provide that petitioners were convicted as charged of the offenses of conspiring to defraud the United States by impeding the lawful Governmental functions of the Internal Revenue Service, in violation of Title 18, U.S.C. sec. 371, as charged in Count I; making and subscribing fraudulent income tax returns, Form 1040 to the Internal Revenue Service in violation of Title 26, U.S.C. sec. 7206(1), as charged in Counts II, III, IV, V, VI, VIII, IX, and XI; [18] and aiding and assisting taxpayers in the preparation of fraudulent income tax returns, Form 1040, in violation of Title 26, USC sec. 7206(2), as charged in Counts VII, X, [19] and XII through XXIV of the Indictment.
In 1985 [20] *320 petitioners filed a motion for a new trial based on the discovery of new evidence. In the motion they claimed that neither they, their trial attorney, or Mr. Murray were aware of the existence of the separate distribution agreement between EMI and Freedom or of any information that EMI had retained an interest in the ancillary rights in the films other than the security interest as a $ 200,000 charge on those rights. Petitioners also claimed that they had no reason to know of the pre-existing arrangement between EMI and Freedom. Respondent did not disclose the agreement during the criminal proceedings, and respondent's witnesses, Mr. Lang and a Mr. Dartnall, testified that Lang was the true and rightful owner of the films and that EMI had sold the three films (other than "'Tis a Pity") to Freedom "free and clear." The separate distribution agreement, petitioners argued, was not discovered until December 1983 or January 1984, and their failure to learn of the evidence before or at the time of trial "was due to a fraud perpetrated by the key government witness." Petitioners further alleged that the Government's key witness presented perjured testimony at the trial by testifying that he had acquired the rights to the films outright and transferred all of those rights to petitioners. In the motion petitioners contended that: The newly discovered evidence is highly material to the issues at trial since it provides a strong defense to the government's claim that [petitioners] had inflated the purchase prices of the films. Although the government's evidence, through the testimony of EMI, established that the value of the films sold to Lang was much less than the [petitioners] paid, the government's evidence also included the perjured testimony *321 of the seller Lang that he had acquired from EMI and transferred all of the rights to the films to the [petitioners]. No distinction was made by the government between the limited rights sold by EMI and the entire rights sold by Lang to Pan, and the June 28 letter agreement was not introduced by the government. To compare EMI's valuations to [petitioners'] purchase prices, is like comparing apples and oranges. Furthermore, the seller of the films was a witness of the government, and there is now an important and substantial issue of whether the government prosecutors knowingly suppressed the June 28 letter agreement from Lang to EMI, which is clear evidence that its key witness, Lang, had defrauded [petitioners] by misrepresenting that he had sold to them all of the rights to the films. This is a question that can only be answered at an evidentiary hearing. * * * Petitioners also submitted a copy of a default judgment obtained by Pan in the Circuit Court of the 11th Judicial Circuit in and for Dade County, Florida, against Freedom and Samuel Lang, in connection with alleged misrepresentations made by Freedom and Lang to Pan about the rights to the films. After an evidentiary hearing *322 on petitioners' Motion for New Trial, the District Court denied the motion.
Discussion
The purpose of collateral estoppel is to protect litigants from the burden of relitigating identical issues and to promote judicial economy by preventing unnecessary or redundant litigation. Parklane Hosiery Co. v. Shore,439 U.S. 322, 326 (1979). Three tests must be met in order for collateral estoppel to apply: The issues presented in the subsequent litigation must be in substance the same as those in the first case; the controlling facts or legal principles must not have changed significantly since the first judgment; and there must be no other special circumstances that would warrant an exception to the normal rules of preclusion. Montana v. United States,440 U.S. 147, 155 (1979).
Newly Discovered Evidence
Petitioners first claim that the controlling facts of their case have changed since the first judgment was entered against them. They contend that although the District Court determined that it was too late for them to use their "newly discovered evidence" at the criminal trial, it is not too late to use the evidence in the trial of their civil fraud case. Petitioners make this assertion *323 acknowledging that the District Court concluded that the evidence could have been discovered by due diligence prior to the criminal trial and therefore used at the criminal trial. In support of their claim, petitioners rely on the same arguments they raised in their Motion for New Trial before the District Court. Respondent argues that petitioners' "new evidence" should not bar his reliance on collateral estoppel. He contends that none of petitioners' "new evidence" is in fact new; that petitioners knew or should have known of its existence; that it was available to petitioners at the criminal trial and is insignificant; and that the factual question to which the evidence pertains was fully litigated at the criminal trial and was considered and reviewed by the Eleventh Circuit Court of Appeals. [21]
Generally, collateral estoppel is "confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling *324 facts and applicable legal rules remain unchanged." Commissioner v. Sunnen,333 U.S. 591, 599-600 (1948). If new evidence is submitted that was not available in the prior proceeding, that would tend to alter the controlling facts as they were found in that proceeding, then the doctrine of collateral estoppel is not applicable because controlling facts have changed. Dean v. Commissioner,56 T.C. 895 (1971); see also Milberg v. Commissioner,54 T.C. 1562 (1970). [22]"Evidence is considered 'available' at the prior proceeding if by exercise of due diligence it could have been produced." Sidoran v. Commissioner,T.C. Memo. 1982-197, 43 T.C.M. 1067, 51 P-H Memo T.C. par. 82,197, citing Dean v. Commissioner, supra;Fairmont Aluminum Co. v. Commissioner,22 T.C. 1377, 1383 (1954), affd. 222 F.2d 622 (4th Cir. 1955). Even though the District Court determined that petitioners' "new evidence" was available for the criminal proceeding, petitioners argue, in effect, that we should make a separate determination as to its availability here. We disagree. The District Court held an evidentiary hearing *325 and concluded that petitioners' evidence could have been discovered. There is no reason to reconsider that determination. No new arguments have been raised, and in fact petitioners have relied almost entirely on the contents of their prior motion in support of their argument in this case. For these reasons we hold that petitioners are collaterally estopped from denying that their evidence was available in the prior criminal proceeding and petitioners cannot now rely on the same evidence to preclude the application of collateral estoppel with respect to the issues in this case. Furthermore, even if we found that the evidence was unavailable, we are not persuaded that it would tend to alter the controlling facts as they were found in the criminal proceeding. See Dean v. Commissioner, supra at 899. Petitioners allege that the new evidence goes to the issue of whether the purchase price of the films was inflated, i.e., whether they paid more for the rights in the films than they were worth. The facts as they appear, without taking into account the side distribution agreement between EMI and Freedom, indicate that petitioners' down payments and notes for the three films other than *326 "'Tis a Pity" totaled $ 1.8 million when those films were allegedly purchased the day before by Freedom for $ 290,000. If anything, the new evidence as petitioners present it would establish that the rights in the films were worth even less than the $ 290,000 paid by Freedom because of the side agreement. We fail to see how evidence showing that the rights in the films might have been worth even less adds credibility to the amount petitioners allegedly paid for the films or their reasons for relying on those amounts to establish basis in the films from which to claim deductions. While the side agreement might, if it is in fact something other than a right in the first $ 200,000 of the proceeds from distribution of the films in the ancillary market, cast doubt on the validity of the transactions at the sellers' end and cast doubt on the credibility of the sellers, it sheds no new light on petitioners' reasons for designating to the films inflated values and claiming deductions based on those amounts.
Prior Convictions
Petitioners next argue that the issues in this proceeding are not the same as those in the criminal proceeding. They claim that their prior convictions under 18 U.S.C. sec. 371 (1982) *327 and sections 7206(1) and 7206(2) do not collaterally estop them from denying that they lacked "intent to evade taxes" when they filed their returns knowing they contained false deductions. [23] Petitioners essentially argue that because "intent to evade taxes" was not an element of any of the prior convictions, the issue was not litigated in the prior action. Respondent does not contest that, as a general rule, convictions under section 7206(1) or 7206(2) are insufficient to collaterally estop petitioners from denying that intent to evade taxes has been proven [24] or that, in some cases, a conviction under 18 U.S.C. sec. 371 by itself, is insufficient to collaterally estop petitioners from denying that element of fraud. [25] Instead respondent argues that, taking into account the "entire factual picture" *328 of this case, collateral estoppel should apply with respect to the element of intent to evade taxes. Essentially respondent is arguing that the facts that were litigated in the prior criminal proceeding that were necessary to prove the crimes under section 7206 and 18 U.S.C. sec. 371 are sufficient to prove that petitioners intended to evade taxes when they knowingly filed false income tax returns for the years 1974 and 1975. Collateral estoppel precludes litigation of issues in a second action that were actually litigated and necessary to the outcome of a prior action. Parklane Hosiery Co., Inc. v. Shore, supra. Respondent, as the moving party, has the burden of proving that petitioners' intent to evade taxes was litigated in the prior action. United States v. Lasky,600 F.2d 765, 769 (9th Cir. 1979). In order to determine whether the issue of intent to evade taxes was litigated in the criminal proceeding we must examine the elements of the crimes that were the subject of that proceeding. Count I of the indictment against petitioners charged that petitioners "did unlawfully, willfully and knowingly *329 combine, conspire, confederate and agree with each other and with diverse other persons whose names are both known and unknown to the grand jury, to defraud the United States, by impeding, impairing, disrupting and defeating, the lawful Governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of the revenue" in violation of 18 U.S.C. sec. 371. Counts II through XXIV charged that petitioners filed individual and partnership tax returns for 1974 and 1975 which were not true and correct, in violation of section 7206(1), that Barshov willfully aided and assisted in the preparation of the 1974 partnership return in violation of section 7206(2), and that both petitioners aided and assisted in the preparation of false individual returns filed by others in violation of section 7206(2). To obtain a conspiracy conviction under 18 U.S.C. sec. 371, the Government was required to prove knowledge of the conspiracy and that some act in furtherance of it was intentionally done. United States v. Falcone,311 U.S. 205 (1940); United States v. Maddox,492 F.2d 104 (5th Cir. 1974). In addition, the Government was required to prove at least the *330 degree of intent necessary for the substantive offense that was the object of the conspiracy. United States v. Feola,420 U.S. 671 (1975); Ingram v. United States,360 U.S. 672 (1959); United States v. Davis,583 F.2d 190 (5th Cir. 1978); United States v. Tavoularis,515 F.2d 1070 (2d Cir. 1975). Thus, while the Government was not required to prove an actual defrauding, (see United States v. Pintar,630 F.2d 1270 (8th Cir. 1980)) proof of Petitioners' specific intent to defraud the Government was required. See, e.g., United States v. Crooks,804 F.2d 1441, 1448 (9th Cir. 1986), opinion modified with respect to another issue 826 F.2d 4 (9th Cir. 1987); United States v. Southland Corp.,760 F.2d 1366 (2d Cir. 1985), cert. denied 474 U.S. 825 (1985). In order to sustain the convictions under section 7206(1) the Government was required to provide, beyond a reasonable doubt, that petitioners acted willfully, with knowledge that their returns were not correct in material respects. United States v. Crooks, supra. For the convictions under sections 7206(2) the Government must have proven that petitionrs aided, assisted, procured, counseled, advised or caused the presentation of a return; *331 that the return was false or fraudulent as to a material matter; and that the acts of petitioners were willful. United States v. Crooks, supra.
For none of the crimes charged was the Government required to prove that petitioners intended to evade their taxes. We have held this to be true for convictions under section 7206, ( Wright v. Commissioner,84 T.C. 636 (1985)), and the same is true for the conviction under 18 U.S.C. sec. 371 in this case given the charges in the indictment and the general jury verdict. Because the verdict was a general verdict we know only that the Government was required to prove petitioners' intent to defraud the United States; we cannot ascertain whether petitioners' intent to evade taxes was proven as well. Even though it appears, as respondent argues, that the "entire factual picture" of this case if proven would be sufficient to show that petitioners intended to evade taxes by setting up the film distribution tax shelters, we cannot, from the face of the verdict, ascertain what facts were found in support of petitioners' conspiracy conviction. Collateral estoppel cannot be relied upon when it is possible that the convictions were based on grounds *332 other than those which are the subject of the collateral estoppel claim. United States v. Lasky, supra.
In the criminal proceeding the facts necessary to prove that petitioners knowingly filed false returns for 1974 and 1975, in violation of section 7206(1), were sufficient to prove that petitioners conspired to defraud the United States in violation of 18 U.S.C. sec. 371 by interfering with the lawful function of the Internal Revenue Service in ascertaining their deductions from the partnerships. See United States v. Southland Corp., supra. No showing that the Government was subject to property or pecuniary loss by the fraud was necessary; only that its legitimate official action and purpose were to be defeated by misrepresentation. Hammerschmidt v. United States,265 U.S. 182, 188 (1924). Because it was possible to support the conspiracy conviction with the same facts relied upon to prove the violations under section 7206, we can conclude only that those facts were proven. Although facts sufficient to show intent to evade taxes may also have been proven, we simply cannot assume that to be true without further evidence of the facts relied upon to support the criminal convictions. *333 Based on the foregoing, respondent's Motions for Partial Summary Judgment will be granted in that petitioners are collaterally estopped from denying that their 1974 and 1975 Federal income tax returns contained false and fraudulent deductions for losses, which deductions petitioners knew were false when they subscribed and presented those returns to respondent, and denied in that petitioners are not collaterally estopped from denying that their 1974 and 1975 income tax returns were filed with false and fraudulent deductions with intent to evade taxes. Petitioners' Motions for Summary Judgment will be treated as Motions for Partial Summary Judgment and will be granted in that they are not collaterally estopped from denying that the addition to tax under section 6653(b) is applicable because they lacked the requisite element of intent to evade taxes. Appropriate orders will be entered.
Footnotes
1. The following cases are consolidated herewith: Emanuel R. Barshov, docket Nos. 4178-79, 10557-80; Emanuel R. Barshov and Ruth Barshov, docket No. 4179-79; James E. Ross, docket No. 4346-79. See n. 2, infra.↩
2. These cases were consolidated for purposes of trial, briefing, and opinion by Order of the Court dated June 23, 1988. ↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. Petitioners James Ross and Emanuel Barshov are the same individuals who were defendants in the criminal case of United States v. Emanuel R. Barshov and James E. Ross, case No. 81-128-Cr-ALH, in the United States District Court for the Southern District of Florida. See 733 F.2d 842↩ (11th Cir. 1984). 5. Petitioners filed their Motions for Summary Judgment on October 2, 1985, and respondent filed his Motions for Partial Summary Judgment on October 10, 1985. Petitioner Barshov filed a response to respondent's motions on October 21, 1985. In his original motions, respondent argued that petitioners were collaterally estopped from denying that all or any part of the underpayment of tax required to be shown on petitioners' individual 1974 and 1975 Federal income tax returns was due to fraud, under the provisions of section 6653(b). Petitioners, in their motions and response, argued that their prior convictions did not establish all of the elements of fraud under section 6653(b), and furthermore, that while respondent relied on their convictions under 18 U.S.C. sec. 371 (1982)and sections 7206(1) and (2) in his motions, his Answer and Amended Answer addressed only the convictions under the latter provisions. After the motions and response were filed, we postponed trial of these cases due to the pending appeal of the related criminal proceedings upon which respondent's collateral estoppel argument is based. In November 1987 the Court was notified that the related proceedings were finally terminated and that the parties were ready to proceed with the present action. On December 31, 1987, respondent filed a Motion for Leave to File Second Amendment to Answer, an Amendment to Motion for Partial Summary Judgment, and a Supplementary Memorandum in Support of Respondent's Motion for Partial Summary Judgment. Respondent's Motion for Leave to File Second Amendment to Answer was granted January 26, 1988, and Respondent's Second Amendment was filed the same day. On February 22, 1988, and March 10, 1988, petitioners filed replies to Respondent's Amendment to Answer (which respondent had filed June 6, 1983) and to the Second Amendment to Answer. Respondent makes the above arguments in lieu of his earlier general collateral estoppel claim with respect to the civil charges of fraud under section 6653(b)↩, having abandoned the argument that petitioners' convictions establish an underpayment of tax. 6. In the original memorandum filed by counsel for petitioner Barshov, petitioners argue that "intent" to evade taxes is not established, yet in the supplemental memorandum, drafted by counsel for petitioner Ross, and adopted by petitioner Barshov, now proceeding pro se, petitioners argue that the element "attempt" to evade taxes is not established. We assume the supplemental memorandum was intended to mean "intent" rather than "attempt," since this case involves section 7206(1) and we have held that intent to evade taxes is not an element of the crime charged under that section. See Wright v. Commissioner,84 T.C. 636, 642-643 (1985), wherein we also discussed the difference between "attempt to evade," which is an element of the offense under section 7201 and can be used to collaterally estop a taxpayer from denying under section 6653(b) that part of his underpayment was "due to fraud," and "intent to evade," which is not an element of section 7206(1)↩.
7. The addition for fraud was pleaded in respondent's amended answer. * Alternatively. ↩
8. See n. 6, Supra.
* Alternatively. ↩
9. The criminal convictions related to Pan and Nap; however the deficiencies include adjustments for deductions relating to other partnerships as well. The facts recited pertain almost entirely to Pan's purchase of films because those are the only documents that were attached to the parties' motions. We assume similar transactions occurred with respect to Nap that were the basis of petitioners' criminal convictions. For a discussion of those transactions see United States v. Barshov,733 F.2d 842 (11th Cir. 1984), cert. denied 469 U.S. 1168↩ (1985). 10. U.S. and Canadian rights were to be sold with respect to this film. ↩
11. Pursuant to the later executed Acquisition Agreement, the purchase price was to be paid partly with cash and partly with the execution and delivery of nonrecourse promissory notes. ↩
12. Petitioners refer to these rights as the "ancillary distribution rights".↩
13. Pan and International executed a distribution agreement on January 1, 1974, which included the same clause that was in the Cinevision-Pan distribution agreement pertaining to the first $ 200,000 received from television or cassette sales. In August 1973, Cinevision assigned its rights in the Pan distribution agreement to International Co. Productions, Inc. (International). As part of this arrangement, Clayton Pantages, on behalf of International, agreed that Samuel Lang would be issued stock in the corporation. 14. The copy of the indemnification agreement in the record does not reflect its date of execution, but copies of correspondence between counsel indicate that as of October 31, 1973, it had not been finalized. ↩
15. A draft of an indemnity agreement between EMI and Pan with respect to the film "'Tis a Pity" did not specifically refer to the distribution agreement between EMI and Freedom: 2. ACCEPTANCE BY PAN. Indemnitee accepts the assignment of Freedom USA Records, Inc.'s ownership interest in the film as more fully set forth in the Acquisition Agreement between Freedom and Indemnitee dated June 29, 1973. Indemnitee further acknowledges and recognizes the security interest running to Indemnitor which constitutes a charge on the television and cassette rights acquired by Indemnitee from Indemnitor to the extent of $ 200,000.00, which charge and the payment of which charge are more fully described in the Acquisition Agreement between Indemnitee and Indemnitor dated June 29, 1973. ↩
16. Counts VII and X charged petitioner Barshov with aiding and assisting in the filing of the false partnership returns in violation of section 7206(2)↩. 17. The judgments in the criminal proceedings are dated January 7, 1983. We note, however, that in respondent's Second Amendments to Answer he recited October 8, 1982, as the date on which petitioners were convicted. 18. Petitioner Ross was convicted of offenses in Counts II, III, VI, VIII, IX, and XI whole petitioner Barshov was convicted of Counts IV, V, VIII, and XI. ↩
19. Only Barshov was convicted on Counts VII and X. ↩
20. There is no date on the copy of the Motion for New Trial that is part of the record, however during the stay of these proceedings the parties informed the Court that they filed a Motion for New Trial in 1985. The copy of the Supplement to Motion for New Trial in the record contains a District Court stamp that reflects a filing date of September 1986. 21. Respondent also contends that the factual basis for petitioners' convictions consisted of more than the facts to which the evidence pertains. The significance of this argument is not entirely clear. ↩
22. Sidoran v. Commissioner,T.C. Memo. 1982-197, 43 T.C.M. 1067↩, 51 P-H Memo T.C. par. 82,197. 23. See n. 5, supra. We assume petitioners concede that they are collaterally estopped from denying that their 1974 and 1975 returns contained false and fraudulent deductions that they knew were false and fraudulent when they subscribed and presented them. See Wright v. Commissioner,84 T.C. 636, 641, n. 9 (1985) (discussion of Considne v. United States,645 F.2d 925, 928-931↩ (Ct. Cl. 1981)). 24. See Wright v. Commissioner, supra.↩
25. See Lahr v. Commissioner,T.C. Memo. 1984-472↩.