**UNITED STATES of America, Appellant,**

v.

**Jose Vargas ACOSTA, Defendant–Appellee.**

**No. 445, Docket 93–1401.**

United States Court of Appeals, Second Circuit.

Argued Nov. 2, 1993.

Decided Feb. 23, 1994.

Maria L. Zanfini, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Nelson W. Cunningham, Assistant United States Attorney, New York, New York, on the brief), for appellant.

Scott H. Greenfield, New York, New York, for defendant-appellee.

Before: OAKES, KEARSE, and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

The United States appeals from so much of a judgment entered in the United States District Court for the Southern District of New York, following a jury trial before Louis D. Stanton, *Judge*, as granted the motion of defendant Jose Vargas Acosta for acquittal of conspiracy to adulterate and misbrand prescription drugs with intent to mislead or defraud, *see* 21 U.S.C. §§ 331, 333, and 351 (1988), in violation of 18 U.S.C. § 371 (1988), and entered a judgment of conviction of conspiracy to adulterate and misbrand such

drugs without intent to mislead or defraud. Though the jury's verdict was that Acosta was guilty of conspiracy with intent to defraud, the district court set that verdict aside on the ground that it was inconsistent with verdicts that his codefendants were guilty of conspiracy without intent to defraud. On appeal, the government contends that, there having been sufficient evidence of intent, any inconsistency was not a ground on which the district court could properly set aside the jury's verdict against Acosta. For the reasons discussed below, we reverse the judgment of acquittal, reinstate the jury verdict, and remand for resentencing.

## I. BACKGROUND

The present prosecution arises out of a large-scale investigation by the Federal Bureau of Investigation ("FBI") into the drug diversion trade, *i.e.*, the business of diverting prescription drugs from their lawful distribution channels. Diverted prescription drugs are obtained by unlicensed persons who sell them to unauthorized persons who often resell them to other individuals who have no prescriptions or to unsuspecting members of the public who do have prescriptions. In September 1991, the investigation focused on Joseph Beauty Supply ("Joseph's"), a health and beauty aids store owned by Acosta.

At Joseph's, Acosta employed codefendant Valentina Estella Santos as a part-time cashier, and codefendant Tito Alfonso Chavarro as a stock clerk and salesman. Joseph's was not a licensed pharmacy, and none of the defendants was a licensed pharmacist. The investigation of Joseph's led to the filing of an indictment against Acosta, Santos, and Chavarro charging them with, *inter alia*, conspiring in violation of 18 U.S.C. § 371 to adulterate and misbrand prescription drugs with intent to defraud and mislead in violation 21 U.S.C. §§ 331 and 333(a)(2). A drug is "adulterated" within the meaning of § 331, to the extent pertinent here, if "it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth" or if it has not been packaged in conformity with "current good manufacturing practices." 21 U.S.C. § 351(a)(1).

The evidence at trial included a number of tape-recorded conversations between defendants and confidential informant Joan Pagano, who died of unrelated causes prior to trial, the testimony of investigating agents, and physical evidence seized from Joseph's pursuant to a search warrant. Taken in the light most favorable to the government, the evidence showed the following.

### A. *The Events*

During a nine-month-long investigation of Joseph's, the FBI obtained drugs from manufacturers and from the United States Food and Drug Administration and made the drugs appear to be adulterated by placing loose capsules in plastic bags or by removing tamper-proof seals, cotton, and packaging inserts from the bottles. Pagano, under FBI supervision, wore a recording device and transmitter and met with one or more of the defendants at Joseph's approximately 20 times between September 5, 1991, and June 27, 1992. Tape-recordings of 14 of these meetings were introduced into evidence and revealed defendants buying, selling, and negotiating with respect to apparently adulterated drugs.

For example, on September 5, 1991, Pagano asked to see "the boss" and said she had various prescription drugs to sell. She told Acosta she had "Ceftin, Zantac, I got 48 ... Lotrisone, [a] couple Losec[,] Ceftin 500, Ceftin 250 and a ... Zantac." (Ellipses in original.) Acosta asked, "How much you selling this week?" He also asked whether she had Tagamet. Though Acosta commented that the bottles Pagano offered had been opened, he bought the drugs and paid her $760.

On October 1, Pagano met at Joseph's with Santos and Chavarro; Acosta was not there. Pagano offered, *inter alia*, a bottle of Zantac. When Chavarro pointed out that the bottle was open, Santos told him he could take it, saying that a cover could be provided and that the price to be paid Pagano would be lower. Santos asked whether Pagano had only Zantac. Pagano offered to get whatever kind of drugs they wanted. Chavarro asked, "What can you find? ... Anything?" He asked whether she could get Ventolin, Proventil, and Tagamet. Santos asked whether Pagano could also get, *inter alia*, Feldene,

Mevacor, Procardia, Carafate, Cipro, Prozac, and Naprosyn. Santos and Chavarro bought Zantac and Lotrisone from Pagano for $678.

On October 8, Pagano met at Joseph's with Acosta and Santos and sold Lotrisone for $322. Santos listed a number of prescription drugs they wished to buy, including Mevacor, Cipro, Ceclor, and Prozac.

On October 29, Pagano met at Joseph's with Acosta, who asked "[w]hat happened." Pagano responded, "I try to make it every week, I can't always do it." Pagano told Acosta she had brought him Zantac and Proventil inhalers. Acosta asked if she had "a bag of Ceftin," and indicated that he wanted, *inter alia*, Ceftin and Cipro 500. Pagano said she would come back in a week and bring Ceftin. Pagano also said she had noticed that Acosta had Retrovir (also known as AZT) and she asked whether he would sell it to her, since she had "a market" for it: "I'll take as many as you have, sealed or unsealed, they don't have to be clean. If they're a loose [*sic*], that's okay. Gimme a price." Acosta replied, "Okay, somebody send me some money for the loose, you know." Eventually, on December 10, he sold her 5,000 loose Retrovir capsules in five ziplock bags.

On April 8, 1992, Pagano arrived at Joseph's with Proventil inhalers, Retrovir, and Lotrisone to sell. Only Santos and Chavarro were there, and they told her at first that they could not pay her for the drugs because Acosta was not there. Santos then contacted Acosta via his beeper and, after talking to him, paid Pagano.

Acosta was arrested on June 30, 1992. In the ensuing court-ordered search of Joseph's, agents found a vast quantity of prescription drugs, including 32 plastic bags filled with Feldene capsules and 79 plastic bottles filled with capsules of Retrovir. They also found various items used to package prescription drugs, including counterfeit tamper-proof sealing material, hundreds of counterfeit labels, and hundreds of counterfeit Retrovir "outserts," *i.e.*, the pamphlets attached to each bottle describing the drug, its dosage, and its effects.

The government's evidence at trial also included the testimony of cooperating witness Roberto Martinez who had owned Joseph's before selling it to Acosta. Martinez testified that as owner of Joseph's, he too had been involved in the drug diversion business and that prior to September 1991, he had purchased diverted prescription drugs from Acosta. These included ulcer pills, pills for high blood pressure, and pills for the treatment of AIDS, and were delivered by Acosta in various forms, including loose and repackaged in used bottles. At first, Martinez's purchases from Acosta totaled some $10,000 a week; that sum later grew to $40,000 a week. Since the purchases to which Martinez testified ended prior to the period covered by the conspiracy charged in the indictment, his testimony was received only on the issue of Acosta's intent.

None of the defendants testified or presented any proof other than evidence that Santos was the mother of Acosta's child. Santos and Chavarro argued principally that they were only part-time or low-level employees of Acosta and merely followed his instructions.

B. *The Verdicts and the Trial Court's Ruling*

As discussed in greater detail in Part II.A. below, § 333(a) provides two levels of penalties for persons convicted of adulterating or misbranding drugs in violation of § 331. The indictment sought to have defendants punished under § 333(a)(2), which provides felony-level penalties of up to three years' imprisonment and up to $10,000 in fines for, *inter alia*, persons who have violated § 331 with intent to defraud or mislead. For a person who did not have such an intent and who was not a repeat offender, § 333(a)(1) provides misdemeanor-level penalties, *i.e.*, imprisonment of not more than one year and a fine of not more than $1,000. Section 371 of 18 U.S.C., under which defendants were prosecuted, provides that if the offense whose commission was the object of the conspiracy is a misdemeanor, the punishment for conspiracy is not· to exceed the punishment provided for that misdemeanor. Accordingly, in submitting the case to the jury, the

trial court instructed the jury to focus on the question of intent to defraud or mislead.

The jury was instructed that it must consider each defendant individually, without regard to evidence that related solely to others. The court instructed that, since the indictment alleged that defendants not only agreed to misbrand and adulterate the drugs but agreed to do so with intent to defraud and mislead, "before you can convict any one of the three defendants of conspiracy to commit these underlying offenses, you must first find beyond a reasonable doubt that the individual defendant specifically intended that acts done pursuant to the conspiracy would defraud and mislead other persons." (Trial Transcript 939.) The court instructed that if the jury found that the government had failed to meet its burden of proof with respect to any defendant's intent to defraud and mislead, the jury should determine whether that defendant conspired to violate the food and drug laws without intent to defraud or mislead.

The court gave the jury a three-part special verdict form, each part dealing with a single defendant and listing three verdicts from which to choose: (1) "guilty with intent to defraud," (2) "guilty but without intent to defraud," or (3) not guilty. Instructed to check only one box for each defendant, the jury found Acosta guilty with intent to defraud; it found Santos and Chavarro guilty without intent to defraud.

Acosta moved pursuant to Fed.R.Crim.P. 29 and 33 for a judgment of acquittal, or in the alternative, a new trial, complaining principally of a supplemental instruction given by the court in response to a question from the jury. In an Order and Opinion dated March 12, 1993, 1993 WL 77311 ("March Opinion"), the district court rejected Acosta's challenge to the supplemental instruction but granted relief on another ground. Though noting that there was "ample evidence ... for the jury to conclude that [Acosta] knowingly and intentionally altered labels and packaging of prescription drugs, and that he intended to mislead buyers into believing that the drugs were packaged in accordance with the law," March Opinion at 4, the court found (a) that there was no evidence of a conspiracy between Acosta and any person other than the other defendants, and (b) that since the jury "specifically found that the other defendants only entered into the conspiracy without intent to defraud," *id.* at 5, there was "insufficient evidence to find that [Acosta] agreed with another person, during the course of the charged conspiracy, to violate the food and drug laws with the intent to deceive consumers," *id.* at 6. The court concluded:

> Because there is insufficient evidence of an unlawful agreement to violate the food and drug laws with the intent to defraud and mislead consumers between Jose Vargas Acosta and any other conspirator during the charged conspiracy, the motion for acquittal of that charge is granted, and he is adjudged guilty only of the conspiracy to violate the food and drug laws without fraudulent intent.

*Id.* at 8–9.

The government moved for reconsideration, citing, *inter alia, United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), which held that inconsistent jury verdicts of guilty on some counts and not guilty on other counts are not a basis for setting aside the verdicts of guilty. The government argued principally that, in view of the substantial evidence that Acosta had conspired with intent to defraud, any inconsistency between the verdicts was likely an exercise by the jury of lenity and was not a basis on which the court could properly set aside the verdict against Acosta. In an Opinion and Order dated April 30, 1993 ("April Opinion"), the district court granted reconsideration but adhered to its original decision. Though again noting that "[t]here was sufficient evidence ... for the jury to conclude that the defendants conspired with each other to violate the food and drug laws with the intent to defraud and mislead," April Opinion at 2, the court held that the jury's verdict that Acosta had so conspired could not stand in light of the "specific finding[s] that defendants Santos and Chavarro did not have the intent to defraud or mislead," *id.* at 4.

The court rejected the government's reliance on *United States v. Powell,* stating as follows:

Here, the jury did not render a verdict of not guilty with respect to any defendant: it found them all guilty of the lesser included offense of conspiracy without intent to defraud, and found that [Acosta] did have the intent to defraud while the others did not. A jury finding that one element of the greater offense is present as to one defendant but absent as to the others does not require, nor even invite, the second-guessing or assumptions concerning the workings of the jurors' minds which *Powell* and its progeny condemn. It simply leads (given the lack of evidence of other persons with whom [Acosta] could have conspired with intent to defraud) to the conclusion that as to that element he stood alone and there was no conspiracy with intent to defraud.

April Opinion at 7.

Judgment was entered convicting Acosta of the misdemeanor conspiracy offense, and he was sentenced principally to two years' probation with special conditions, including the requirements that he perform 300 hours of community service and allow the Probation Office to inspect any establishment he manages or owns. This appeal by the government followed.

## II. DISCUSSION

On appeal, the government argues principally that the district court improperly acquitted Acosta on the basis of inconsistent jury verdicts and should not have done so in light of the sufficiency of the evidence to show that all defendants conspired with intent to defraud. For the reasons that follow, we conclude that the judgment should be reversed and the jury's verdict reinstated.

A. *The Supposed Inconsistency*

Before reaching the argument relied on by the government, we note our view that the verdicts were not inconsistent. Although the district court assumed that a shared intent *to defraud* was required, a view perhaps occasioned by the government's merging of §§ 331 and 333 in the indictment (*e.g.*, ¶ 13, alleging "conspir[acy] ... to violate ... Sections 331(b) and 333(a)(2) (adulterating and misbranding prescription drugs with intent

to defraud and mislead)"), that assumption seems contrary both to the design of the food and drug laws and to basic conspiracy law.

■ Section 331, entitled "Prohibited acts," provides in pertinent part as follows:

The following acts and the causing thereof are prohibited:

. . . .

(b) The adulteration or misbranding of any food, drug, device, or cosmetic in interstate commerce.

(c) The receipt in interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise.

. . . .

(i)(1) Forging, counterfeiting, simulating, or falsely representing, or without proper authority using any mark, stamp, tag, label, or other identification device authorized or required by [certain] regulations . . . .

. . . .

(k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

21 U.S.C. § 331(b), (c), (i), and (k). These provisions defining the prohibited conduct do not include an intent requirement. The intent-to-defraud ingredient is found instead in § 333, which prescribes the penalties for a violation of § 331. Section 333 provides felony-level penalties for one who has violated § 331 with intent to defraud or mislead, but provides only misdemeanor-level penalties for one who, assuming he had not previously been convicted of such conduct, has adulterated without that intent:

(1) Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both.

(2) Notwithstanding the provisions of paragraph (1), if any person commits such a violation after a conviction of him under this section has become final, or commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both.

21 U.S.C. §§ 333(a)(1) and (2).

■ This separation of the fraudulent-intent requirement from the provisions that define the substantive offenses reflects Congress's attempt to "keep impure and adulterated food and drugs out of the channels of commerce" by having § 331 "dispense[ ] with the conventional requirement for criminal conduct—awareness of some wrongdoing." *United States v. Dotterweich*, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943). Thus, a defendant is made criminally liable for violating § 331 without regard to his mental state or criminal history. Congress simply enhanced the penalties for the aggravating circumstances reflected by a defendant's fraudulent intent or his § 331 recidivism. The Supreme Court observed a half-century ago that

> [t]he Food and Drugs Act of 1906 was an exertion by Congress of its power to keep impure and adulterated food and drugs out of the channels of commerce. By the Act of 1938, Congress extended the range of its control over illicit and noxious articles and stiffened the penalties for disobedience. The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words.

*United States v. Dotterweich*, 320 U.S. at 280, 64 S.Ct. at 136. If the defendants plainly agreed to violate § 331, and one of them did so with intent to defraud, we conclude that to allow the latter to escape the more severe penalty Congress saw fit to attach to that intent, merely because his codefendants lacked a similar intent, would show little regard for the legislative goal of impeding the flow of adulterated drugs.

■ The district court's imposition of the condition that, for any coconspirator to incur the more severe penalty, at least two of the persons who conspired to adulterate drugs must also have shared an intent to defraud or mislead is also contrary to basic conspiracy law. It is well established that two or more defendants may be guilty of participating in a single conspiracy where they agreed on the essential nature of the plan, even though their goals may not have been congruent. *See, e.g., United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1191–92 (2d Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *United States v. Heinemann*, 801 F.2d 86, 92 & n. 1 (2d Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987); *United States v. Bagaric*, 706 F.2d 42, 63 (2d Cir.1983), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir.1980). In *United States v. Beech–Nut Nutrition Corp.*, for example, a food company official was found guilty of conspiring with suppliers to ship adulterated foods in interstate commerce with intent to defraud, notwithstanding evidence that the suppliers' goal was simply to sell adulterated precursor concentrate to the food company, regardless of whether or not the foods ultimately prepared and shipped were adulterated.

We see no reason why this principle should not be applied here, especially since § 331 prohibits adulteration regardless of any intent to defraud, thereby authorizing two or more defendants to be convicted of conspiring to violate § 331 regardless of whether any of them had intent to defraud. If, in addition to proving that two or more persons conspired to violate § 331, the government proves that any defendant who so conspired also had the intent to defraud or mislead, that defendant should be subject to the more severe penalty provided by § 333(a)(2).

### B. The Proper Treatment of Inconsistent Verdicts

■ Even assuming that the verdict against Acosta was inconsistent with the verdicts as to his codefendants, we find no basis

for relief, for it has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty. *See, e.g., Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932); *United States v. Dotterweich,* 320 U.S. at 279, 64 S.Ct. at 135; *Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981); *United States v. Powell,* 469 U.S. 57, 62–65, 105 S.Ct. 471, 475–477, 83 L.Ed.2d 461 (1984) (*"Powell"*); *United States v. Coplon,* 185 F.2d 629, 633 (2d Cir. 1950), *cert. denied,* 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952).

In *Powell,* the Supreme Court noted that the jury, though presumed to follow the instructions of the trial court, may make its ultimate decisions " 'for impermissible reasons,' " 469 U.S. at 63, 105 S.Ct. at 476 (quoting *Harris v. Rivera,* 454 U.S. at 346, 102 S.Ct. at 464), such as "mistake, compromise, or lenity," *Powell,* 469 U.S. at 65, 105 S.Ct. at 476, but its power to do so is " 'unreviewable,' " *id.* at 63, 105 S.Ct. at 476 (quoting *Harris v. Rivera,* 454 U.S. at 346, 102 S.Ct. at 464). When verdicts are inconsistent, " '[t]he most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt,' " *id.,* 469 U.S. at 64–65, 105 S.Ct. at 476 (quoting *Dunn v. United States,* 284 U.S. at 393, 52 S.Ct. at 190). The *Powell* Court rejected as

> imprudent and unworkable[ ] a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake.

469 U.S. at 66, 105 S.Ct. at 477. Thus, the court is not to try to guess which of the inconsistent verdicts is "the one the jury 'really meant.' " *Id.* at 68, 105 S.Ct. at 478.

In light of *Powell,* one defendant's conspiracy conviction does not become infirm by reason of jury verdicts of not guilty against all of his alleged coconspirators. *United States v. Garcia,* 882 F.2d 699, 704–05 (2d Cir.), *cert. denied,* 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989); *United States v. Bucuvalas,* 909 F.2d 593, 597 (1st Cir.1990); *United States v. Thomas,* 900 F.2d 37, 40 (4th Cir.1990); *United States v. Andrews,* 850 F.2d 1557, 1561 (11th Cir. 1988), *cert. denied,* 488 U.S. 1032, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989). Rather, the convicted defendant's protection against an irrational verdict is his ability to have the courts review the sufficiency of the evidence to support his conviction.

> This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt.

*Powell,* 469 U.S. at 67, 105 S.Ct. at 478. The review of the legal sufficiency of the evidence with respect to one count should be independent of the jury's determination that the evidence on another count was insufficient to meet the government's burden of persuasion.

Under these principles, assuming that the verdicts as to Santos and Chavarro were inconsistent with the verdict as to Acosta, that inconsistency provided no basis for disturbing the verdict as to Acosta. We reject the district court's view that the jury, which simply checked off boxes on the verdict form that the court gave it, "did not render a verdict of not guilty with respect to any defendant." April Opinion at 7. Plainly the jury found Santos and Chavarro not guilty of the offense that the court had described to it as the more serious of two offenses. The court's drafting of the verdict form in such a way that the phrase "not guilty" does not appear *in haec verba* did not change the substance of those acquittals. We also reject the district court's view that the verdicts returned as to Santos and Chavarro were "specific finding[s]" that those two defendants "did not have the intent to defraud or mislead." *Id.* at 4. Under our jurispru-

dence, a verdict of "not guilty" is not the equivalent of a finding of "innocent"; a verdict indicating that the jury did not find intent proven beyond a reasonable doubt does not mean that it found that there was no intent. Indeed, under the teaching of *Powell,* we are not entitled to interpret an inconsistent verdict of acquittal as even showing that the jury was "not convinced of the defendant's guilt." 469 U.S. at 65, 105 S.Ct. at 476. A court knows only what the jury's verdicts were, not what the jury found, and it is not within the province of the court to attempt to determine the reason or reasons for verdicts that are inconsistent.

■ As to the sufficiency of the evidence to support Acosta's conviction for adulteration with intent to defraud, the proof was overwhelming. The evidence was clear that defendants knew they were dealing in adulterated drugs, and the items seized from Acosta's store included not only large quantities of diverted drugs but also hundreds of counterfeit labels, hundreds of counterfeit informational outserts, and the machinery for manufacturing counterfeit packaging. Plainly, the evidence was sufficient, as the trial court recognized, to permit a reasonable factfinder to infer that defendants intended to mislead or defraud.

## CONCLUSION

We have considered all of Acosta's arguments in support of the judgment below and have found them to be without merit. For the foregoing reasons, we conclude that the district court erred in setting aside the jury's verdict finding Acosta guilty of conspiracy to violate 21 U.S.C. § 331 with intent to defraud or mislead. The judgment of acquittal is reversed, and the jury verdict is reinstated; the judgment of conviction of conspiracy without intent to defraud or mislead is vacated; and the matter is remanded for entry of judgment in accordance with the foregoing and for resentencing.