UNITED STATES of America, Plaintiff,

v.

Pablo CAMACHO, Charlie Haynes, Jr., Nathaniel Veal, Jr., and Andy Watson, Defendants.

No. 93–352–CR.

United States District Court, S.D. Florida.

Oct. 19, 1994.

Daniel S. Gelber, Asst. U.S. Atty., John S. Kastrenakes, Florida Asst. State Atty., Miami, FL, for plaintiff.

Hugo Rodriguez, Asst. Federal Public Defender, John Bergendahl, Roy Kahn, Milton Hirsch, Miami, FL, for defendants.

### ORDER

MARCUS, District Judge.

THIS CAUSE comes before the Court upon the following motions: (1) Defendant Pablo Camacho's Preliminary Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial, filed July 1, 1994; and (2) Defendants Andy Watson, Nathaniel Veal, and Charlie Haynes's Joint Motion for Leave to Interview Members of the Jury, filed July 5, 1994. The first motion seeks the Court's permission to interview certain members of the jury as to the manner in which they reached a verdict of guilty on a charge of obstruction of justice. The second asks for a judgment notwithstanding the verdict or a new trial arising from the same basic circumstances as the first motion. Finally, we take this opportunity to discuss in greater detail a letter that was received by the Court from a juror concerning the deliberative process and which was placed under seal by this Court on July 6, 1994. For the reasons that follow, both motions must be and are DENIED.

### I.

On June 23, 1994, the Defendants Camacho, Haynes, Veal, and Watson were each convicted on a charge of obstruction of justice (Count II of the Indictment). These Defendants, as well as two others, were found not guilty as to a variety of other charges in the indictment, including perjury and conspiracy to obstruct justice. On that date, the Court received the jury verdict in open court and polled each of the jurors to ensure that the written verdict was also the verdict of each individual juror. No counsel for any of the parties objected during this process as to the procedural form of taking the verdict or as to any of the particular responses given by individual jurors during the polling of the jury.

On July 1, 1994, counsel for Defendant Camacho filed the above-mentioned motion, attaching the affidavit of juror one concerning the manner in which the jury had reached its verdict as to the Defendants. Subsequently, on July 6, 1994, counsel for Defendant Camacho filed an affidavit from juror two, also in support of the July 1, 1994 motion. The statements of these two jurors in the affidavits are identical, including comments as to why the jury convicted as to one but not other Counts in the Indictment, and as to a belief that some jurors had discussed the merits of the case and expressed opinions as to guilt or innocence before the case was submitted to the jury for deliberation. Based upon these two affidavits, Defendant Camacho seeks a judgment notwithstanding the verdict or a new trial.

Also on July 1, 1994, this Court received a letter in chambers from juror number four in the case.[1] This Court responded to the letter by issuing a Sealing Order on July 6, 1994, notifying all parties of the receipt of the letter and the Court's direction to the Clerk of the Court to keep the letter under seal until further order of the Court. As stated at the time, the decision to seal the

---

1. On approximately June 28, 1994, juror number four appeared at the undersigned's chambers in Miami seeking to discuss her views as to the jury deliberation process and the verdicts reached. The Court was sitting in Key West, Florida, during that week and juror number four was in-

formed that the proper manner in which to present any comments concerning the verdicts would be in the form of a written communication sent to chambers. Juror number four thereafter sent the letter in question to chambers, dated June 30, 1994.

letter was based on our conclusion that the overwhelming majority of the letter goes to matters that fall unquestionably within the most secretive, internal workings of the jury's deliberative process. After thoroughly reviewing this letter, we noted specifically in the Sealing Order that there was an extensive discussion offered by juror number four as to the positions taken by the jurors at different points in the deliberative process, the numerical results of preliminary votes listing the name of each juror and the position taken at that moment during deliberations, and a final detailed process by which a verdict apparently was reached. Upon further review, we remain convinced that the overwhelming majority of the letter submitted must remain under seal as it plainly summarizes and explores the internal workings of the jury's deliberative process.

Finally, on July 5, 1994, Defendants Watson, Veal, and Haynes's filed the second motion listed above—a joint motion for leave to interview members of the jury. Counsel for the three Defendants state in the joint motion that they have a good faith belief that the jury's deliberative process was improperly influenced or affected by an "extrinsic influence" based upon conversations between legal counsel for Defendant Veal and two unnamed jurors shortly after the verdict was taken in the case.

## II.

The various post-verdict statements made by certain jurors and the representations contained in the Defendants' motions raise questions as to the manner in which the jury reached a verdict in this case. After reviewing the applicable rules of evidence and controlling case law discussing allegations of juror misconduct, we turn to each of the allegations raised in the various statements and motions. For the reasons that follow, we conclude that as to each of the allegations of juror misconduct implied in the statements and motions, Defendants have failed to carry their burden to show that an extrinsic influence affected the jury deliberations in such a manner as to warrant leave to interview the jurors in this case, or a new trial as to Count II, or finally, a judgment notwithstanding the verdict as to Count II.

### A.

Rule 606(b) of the Federal Rules of Evidence provides initial guidance as to inquiries into the validity of a jury verdict:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other person's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Although the language of the Rule is clear, the legislative history behind Rule 606(b) is particularly illuminating as to the limited contours of a court's review of matters relating to the deliberative process. Initially, the House of Representatives favored a version of the Rule that would have allowed jurors "to testify about objective matters occurring during the jury's deliberation, such as the misconduct of another juror or the reaching of a quotient verdict." H.R.Conf.Rep. No. 93–1597, 93d Cong., 2d Sess. (1974), U.S.Code Cong. & Admin.News 1974, p. 7051. The Senate version, however, contemplated a far more limited review of the jury's deliberative process, as evinced by the Senate Report on Rule 606(b):

> [The House version] deletes from the Supreme Court version the prescription against testimony "as to any matter or statement occurring during the course of the jury's deliberations." This deletion would have the effect of opening verdicts up to challenge on the basis of what happened during the jury's internal deliberations, for example, where a juror alleged that the jury refused to follow the trial

judge's instructions or that some of the jurors did not take part in the deliberations.

Permitting an individual to attack a jury verdict based on the jury's internal deliberations has long been recognized as unwise by the Supreme Court.

\* \* \* \* \* \*

As it stands then, the [House version] would permit the harassment of former jurors by losing parties as well as the possible exploitation of disgruntled or otherwise badly-motivated ex-jurors.

S.Rep. No. 93–1277, 93rd Cong., 2d Sess. (1974), U.S.Code Cong. & Admin.News 1974, p. 7051. The Senate version, which "does not permit juror testimony about any matter or statement occurring during the course of the jury's deliberations," was subsequently adopted by the Conference Committee. H.R.Conf.Rep. 93–1597.

The narrow scope of a district court's review of the jury deliberative process, as made clear by the language of Rule 606(b) and the Rule's legislative history, was further illuminated by the United States Supreme Court in *Tanner v. United States*, 483 U.S. 107, 116–27, 107 S.Ct. 2739, 2745–51, 97 L.Ed.2d 90 (1987). In *Tanner*, which represents the Court's most detailed recent explanation of Rule 606(b), the Court held that Rule 606(b) prohibited the taking of juror testimony "on juror conduct during deliberation, including juror intoxication," since such conduct was not an "external" influence. The facts in *Tanner* showed that following the defendant's conviction, defense counsel was contacted by two jurors in the case regarding allegations of juror intoxication during the trial. Specifically, these jurors indicated that several of the jurors drank alcohol during court recesses, that four of the jurors smoked marijuana "quite regularly" during the trial, that two of the jurors ingested cocaine on numerous occasions, and that some of the jurors were falling asleep during trial. The Supreme Court, citing extensively to the legislative history detailed above and to the strong policy consideration underlying the confidentiality of jury deliberations, concluded that testimony on the issue of juror intoxication was prohibited by Rule

606(b), notwithstanding the serious nature of the juror misconduct alleged. *Tanner* is thus illustrative of the strict manner in which we are required to apply Rule 606(b).

■ From the general principles laid out above, it becomes clear that before a district court may delve into the conduct of the jury in reaching its verdict there must be a specific and substantial showing that an extrinsic influence has affected the jury process. As the United States Court of Appeals for the Eleventh Circuit has observed:

No per se rule requires the trial court to investigate the internal workings of the jury whenever a defendant asserts juror misconduct. *United States v. Barshov*, 733 F.2d 842, 851 (11th Cir.1984). "The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality." *Id.* (citation omitted). *To justify a post-trial hearing involving the trial's jurors, the defendant must do more than speculate; he must show " 'clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred.' "* *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983)). "The more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate." *United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir.1985).

*United States v. Cuthel*, 903 F.2d 1381, 1382–83 (11th Cir.1990) (emphasis added); *see also United States v. Hooshmand*, 931 F.2d 725, 736–37 (11th Cir.1991); *United States v. Griek*, 920 F.2d 840, 843 (11th Cir.1991); *United States v. Sokoloff*, 696 F.Supp. 1451, 1458 (S.D.Fla.1988) (Marcus, J.); *cf. Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991) (discussing Eleventh Circuit precedent in habeas corpus setting). Due to the importance and complexity of the factual circumstances surrounding the determination of whether to allow juror interviews to take place, a district court's refusal to allow such interviews to take place is reviewed under an abuse of discretion standard. *Hooshmand,*

931 F.2d at 737 (citing *Cuthel,* 903 F.2d at 1382).

We pause to note that the motion to interview jurors filed by Defendants Watson, Veal, and Haynes—and our decision—is based not only upon Rule 606(b) and case precedent but also upon Rule 11.1E of the Local Rules of the United States District Court for the Southern District of Florida. Rule 11.1E states, in relevant part:

> Before, during, and after the trial, a lawyer should avoid conversing or otherwise communicating with a juror on any subject, whether pertaining to the case or not. Provided, however, after the jury has been discharged, *upon application in writing and for good cause shown, the Court may allow counsel to interview jurors to determine whether their verdict is subject to legal challenge.* In this event, the Court shall enter an order limiting the time, place, and circumstances under which the interviews shall be conducted. The scope of the interviews should be restricted and caution should be used to avoid embarrassment to any juror and to avoid influencing his action in any subsequent jury services.

S.D.Fla.LR. 11.1E (emphasis added).[2] We construe this "good cause shown" standard— as mandated by the Eleventh Circuit—to require the moving party to satisfy the requirements of Rule 606(b) *before* a motion to interview jurors will be granted. *United States v. Griek,* 920 F.2d 840, 842 (11th Cir. 1991) ("... good cause under the local rule may be shown only by satisfying the requirements of the exception stated in the Federal Rule"). Accordingly, the standard to which we look—under either Rule 606 of the Federal Rules of Evidence or Local Rule 11E.1—

requires us to determine whether the Defendants have presented substantial evidence that a specific, nonspeculative impropriety has occurred.[3]

#### B.

With these general principles laid out, we turn to the particular allegations in the motions, affidavits, and letter mentioned earlier. For the purposes of this discussion, we address the allegations contained in Defendant Camacho's motion not only for the purposes of his Motion for Judgment Notwithstanding the Verdict or, in the alternative, for New Trial, but also for the purposes of the Motion for Leave to Interview the Jurors. For the reasons that follow, we conclude that each of the series of post-verdict comments made by various jurors do not merit further judicial inquiry into the jury's deliberative process because the Defendants have failed to make an adequate showing of *extrinsic* influence to overcome the presumption of jury impartiality. *Cuthel,* 903 F.2d at 1382–83.

#### 1.

■ We first address various allegations made by jurors number one and two in their affidavits concerning alleged compromises during the deliberative process and speculation among the jurors concerning possible future court action. We begin with the identical paragraph three of the affidavits submitted, which states:

> The jury's verdict as to Count II did not reflect, and was not intended to reflect, the evidence presented at trial. We agreed to four convictions on Count II because we thought we were acting in the best interests of the defendants. We feared that if

---

**2.** The Eleventh Circuit has repeatedly upheld the validity of Local Rule 11.1E against constitutional challenge. *United States v. Hooshmand,* 931 F.2d 725, 736–37 (11th Cir.1991) (upholding validity of predecessor to Local Rule 11.1E, Local Rule 16E, against First and Sixth Amendment challenges); *United States v. Griek,* 920 F.2d 840, 842–844 (11th Cir.1991) (upholding validity of predecessor to Local Rule 11.1E against First Amendment challenge); *see also United States v. Sokoloff,* 696 F.Supp. 1451, 1457 (S.D.Fla.1988).

**3.** In connection with the propriety of attorneys making contacts with jurors, we finally note that a local rule similar to ours came up in the

Supreme Court's decision in *Tanner* on the topic of whether the district court could have simply struck juror affidavits obtained in violation of the local rule preventing juror contact with attorneys concerning deliberations and the like. The Supreme Court observed:

> The juror affidavit submitted in support of the second new trial motion was obtained in clear violation of the District Court's order and the court's local rule against juror 'interviews, M.D.Fla.Rule 2.04(c); on this basis alone the District Court would have been acting within its discretion in disregarding the affidavit. *Tanner,* 483 U.S. at 126, 107 S.Ct. 2750.

**1532**

we hung on Count II, the prosecution would subject the defendants to the burden of re-trial; we believed that this court, or a higher court, would throw out the verdicts of guilty on Count II as clearly inconsistent with the verdicts of acquittal on other counts.

Defendant Camacho concedes the general principle that a juror is incompetent to impeach the verdict as to matters that inhere in the verdict, but argues that these statements are indicative of an "improper artifice" meriting a finding of acquittal as to Count II (if not at least further interviews of jury members).

We disagree. Assuming that the statements accurately reflect the thoughts of jurors one and two, these statements go to the heart of the jury deliberative process and we may not use them as a basis for further inquiry. Put simply, the suggestion that individuals encountered pressure from other jurors during their debates or that the jurors reached a compromise in the verdict that resulted from their debate is not something that this Court will interfere with, be it through an application for leave to interview jurors or on a motion for judgment notwithstanding the verdict on the basis of inconsistency. As the Second Circuit has recently observed:

> In [United States v.] Powell, the Supreme Court noted that the jury, though presumed to follow the instructions of the trial court, may make its ultimate decisions " 'for impermissible reasons,' " [469 U.S. 57, 63, 105 S.Ct. 471, 476, 83 L.Ed.2d 461 (1984)] (quoting Harris v. Rivera, 454 U.S. [339, 346, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981)]), such as "mistake, compromise, or lenity," Powell, 469 U.S. at 65, 105 S.Ct. at 476, but its power to do so is "unreviewable." [citation omitted].
>
> \*  \*  \*  \*  \*  \*
>
> The Powell Court rejected as imprudent and unworkable[ ] a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individu-

alized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake.

469 U.S. at 66, 105 S.Ct. at 477. Thus, the court is not to try to guess which of the inconsistent verdicts is "the one the jury 'really meant.' " Id. at 68, 105 S.Ct. at 478.

United States v. Acosta, 17 F.3d 538, 545 (2d Cir.1994).

The Fifth Circuit recently reviewed a case with similar allegations concerning pressure and compromise in the jury room and reached the same conclusion as we do today. United States v. Straach, 987 F.2d 232, 241–243 (5th Cir.1993). In Straach, the defendant filed a motion for mistrial based upon two affidavits from jurors indicating that they had been forced to compromise on the verdict as a result of pressure from other jurors. Id. at 241. The Fifth Circuit rejected this as a possible basis for a juror misconduct claim, observing:

> Even a compromise verdict cannot be challenged later by a juror if a reasonable jury could have found that the conviction was supported by the evidence beyond a reasonable doubt. United States v. Dotterweich, 320 U.S. 277, 278–279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943); [other citation omitted]. Although testimony by jurors about "objective jury misconduct" is admissible in some jurisdictions, it generally is not admissible in the federal courts. See Notes following Fed.R.Evid. 606(b). See also Tanner v. United States, 483 U.S. 107, 117, 107 S.Ct. 2739, 2745, 97 L.Ed.2d 90 (1987). Although two jurors came forward after the verdicts had been returned and recorded, stating that they had maintained throughout the jury's deliberations that defendant was not guilty on all counts, but had been pressured into compromising their verdicts on counts two and five, this "pressure" cannot count as an outside influence. See, e.g., United States v. Vincent, 648 F.2d 1046, 1049–50 (5th Cir.1981) ...

Straach, 987 F.2d at 241–42.

At most, the juror statements in this matter indicate that the jury worked through a

process of compromise to reach its verdict—a process which constitutes the internal workings of the jury here without any indication of outside influence. To the extent that the jurors' statements reflect a compromise verdict, we conclude that the statements detailed above do not provide a basis for further inquiry under Rule 606(b). Plainly the law permits jurors to reach a compromise verdict in their deliberations.

Similarly, to the extent to which these individual jurors' statements reflect speculation by some jurors as to future effects of their verdict, for example in the form of future court actions, we also find these to be matters inhering in the internal deliberative process that do not merit further inquiry by this Court, let alone a directed verdict or new trial for the Defendant. In *Straach,* for instance, the post-verdict juror statements indicated that the jury considered possible penalties that the defendant might face. *Id.* at 242. The Fifth Circuit rejected this argument, once again finding that without evidence that possible punishments were learned from outside sources the evidence offered in the affidavits was inconsequential. *Id.* Similarly here, there is no indication that the jurors had knowledge from any outside source as to penalties that the Defendants might face or the likely outcome of future court actions in the case. Without more, the above-stated excerpt from the affidavits of two jurors do not merit further inquiry. *Cf. Morgan v. Woessner,* 997 F.2d 1244, 1261 (9th Cir.1993) (juror speculation concerning whether damages would cover attorney's fees and speculation as to the amount of fees, without evidence of external influence, do not warrant hearing).

■ Finally, we consider the statements contained in the affidavits of jurors one and two concerning the jury foreman's apparent unwillingness to submit particular questions to the Court during jury deliberations not to be a basis for granting juror interviews. The identical paragraph six of the two juror's affidavits states:

On more than one occasion, members of the jury wanted to send written notes or requests for assistance to the court. The foreman refused to submit these messages,

or to allow others to submit them. This was particularly troublesome as to Count II, which we never really understood and as to which some of wanted to be reinstructed. Certain jurors insisted that Count II had to do with the use of excessive force.

As to the first two sentences in the excerpt above, the statements of the jurors, once again, simply go to the heart of jury deliberations—the procedures about which the jurors operated in reaching their verdict. To allow interviews as to this statement would invite detailed inquiry into the manner in which a foreman was selected, how the various jurors felt about the foreman, whether the jury foreman was intimidating other jurors, and the like. This sort of inquiry is precisely the result that the Rule 606(b) of the Federal Rules of Evidence seeks to prevent. *See United States v. Casamayor,* 837 F.2d 1509, 1515 (11th Cir.1988) ("the alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the verdict under Rule 606(b) ...”), *cert. denied sub nom. Barker v. United States,* 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989). As to the final two sentences concerning the understanding of some jurors as to Count II, this is perhaps the most extreme example of all of the statements concerning the deliberative process—the thoughts concerning the meaning and application of the jury instructions to the facts of the case. That this is at the heart of the jury deliberation process should be plain from its terms. *See United States v. Ayarza–Garcia,* 819 F.2d 1043, 1051 (11th Cir.1987) ("Post-verdict inquiries into the existence of impermissible extraneous influences on a jury's deliberations are allowed under appropriate circumstances, but inquiries that seek to probe the mental processes of jurors are impermissible.").

2.

■ The affidavits of jurors one and two also contain identical statements to the effect that certain jurors were engaged in premature deliberations and expressed their opinions to other jurors before the Court submitted the case to the jury for its deliberations. Although none of the Defendants specifically

raise the argument that such conduct alone would constitute juror misconduct sufficient to warrant leave to interview jurors or a new trial, we address the issue for the sake of generating a complete record as to the allegations contained in the affidavits. Paragraph seven of the affidavits of the two jurors states that "[i]n violation of the court's instructions, some jurors discussed the merits of the case, and expressed opinion as to the guilt or innocence of defendants, long before the case was submitted to the jury for deliberation." No further detail or explication is offered. The Eleventh Circuit, as well as other courts, have been repeatedly confronted with such situations and have consistently held that discussions between jurors and the expression of opinion as to guilt or innocence, while not condoned and in violation of court instructions, is not grounds for leave to interview jurors or for a new trial because the activity—as it is alleged here—lacks an extrinsic influence. *Cuthel*, 903 F.2d at 1382–83 (evidence of premature deliberation could not be subject of post-verdict inquiry because "there was no allegation of extraneous prejudicial information being brought to the jury's attention; nor was there evidence of improper outside influence sufficient to warrant an inquiry"); *United States v. Bertoli*, 854 F.Supp. 975, 1107 (D.N.J.1994) (post-verdict juror statement indicated that another juror repeatedly expressed opinion as to guilt of defendant during trial; premature deliberations or improper jury discussions do not constitute extraneous irregularities); *United States v. Williams–Davis*, 821 F.Supp. 727, 741 (D.D.C.1993) (juror discussions concerning case before submission to jury were not extraneous influence under Rule 606(b), and thus did not warrant a hearing).

### 3.

■ We next turn to allegations made by jurors one, two, and four that not only was one of the jurors not present during portions of the jury deliberations but also that this juror did not affirmatively state that she acceded to the verdict when her name was called during the polling of the jury. First, there is an allegation that one juror was not present during key moments of the deliberative process, including when the jury decided upon a final verdict in the jury room. Paragraph four of the two jurors' identical affidavits states: "One member of the jury was in the bathroom and not present when the final decision on the verdicts was made." We presume that this paragraph refers to juror number four, who stated in her letter to this Court that she was in the bathroom during some period of time during the jury deliberations. Second, there is the allegation that one of the jurors did not accede to the verdict when the jury members were individually polled following the reading of the verdict. Paragraph five of the affidavits of jurors one and two states: "[a]t the time the jury was polled, one juror simply lowered her head at the time she was asked if she acceded in the verdict. If she had repudiated the verdict audibly, I would have done the same." These statements presumably refer to juror number four, once again, because juror number four's letter to the Court states something similar in the following *un-edited* passage:

> When the verdicts were read by Sue [the Courtroom Deputy] I was in shock I was looking at every one in the court room so many people then you said that you were going to poll the jury everyone at a time looked at me I didn't know what to do I felt trapped if I said the truth loudly which is NO a mess of people noise I just SIghed and a "S" followed with me pulling my hair down in front of my face and tears flowed I was hoping you were going to have me repeat my answer and NO was on the tip of my tongue but you didn't.

Defendants maintain that each of the respective actions taken by juror number four merits at least further inquiry in the form of jury interviews.

Neither the lack of juror number four's presence during portions of the deliberations nor the manner in which she acceded to the verdict during the polling of the jurors merits further inquiry by the Court and counsel for possible juror misconduct, primarily based upon the specific factual circumstances surrounding this case and the policy reasons that underlie Rule 606(b) of the Federal Rules of Evidence.

To begin, following the receipt of the jury note that a verdict had been reached on all Defendants as to all counts, and after the jury was assembled in open court, this Court proceeded through a number of procedural steps designed to ensure that the verdict given by the jury accurately reflected the jurors' individual views of guilt or innocence as to the Defendants. First, the Court inquired of the jury foreman whether the jury had "reached a *unanimous* verdict as to each defendant, as to each count," to which the foreman replied in the affirmative. Trial Transcript, June 23, 1994, p. 4 (emphasis added). In the moments following this, *no* member of the jury contradicted the foreman or in any way indicated that the jury had failed to reach a unanimous verdict. The Court then inquired as to whether the jury foreman had filled out, signed, and dated the verdict forms, to which he replied in the affirmative. *Id.* After that, the Court informed the jury that the Courtroom Deputy was going to publish the verdict and then poll the individual jurors as to their agreement with that verdict. *Id.* at 4–5. Specifically, the Court stated to the jurors:

I am going to ask the courtroom deputy to publish each of the six verdicts aloud.

What that means simply is she will read the verdicts as they appear. And I will then ask her to poll the jury, which means she will ask you individually whether the verdicts as read are your verdicts and you will have to answer that question.

*Id.* at 5. The Courtroom Deputy proceeded to publish the jury's verdict by reading the verdicts aloud as to each Defendant and as to each Count.

With these steps completed, the Court proceeded next to the polling of the jurors individually. The following passage, as recorded in the official transcript of the Court Reporter, contains the following colloquy between the Courtroom Deputy Clerk (CDC) and the individual jurors:

CDC: Will the jury please rise and harken to its verdict. As your name is called, answer audible yes or no.

\*   \*   \*   \*   \*   \*

CDC: [Juror Number One], is the verdict as I read it your verdict?

Juror: Yes, it is.

CDC: [Juror Number Two], is the verdict as I read it your verdict?

Juror: Yes, it is.

CDC: [Juror Number Three], is the verdict as I read it your verdict?

Juror: Yes.

CDC: [Juror Number Four], is the verdict as I read it your verdict?

Juror: Yes.

CDC: [Juror Number Five], is the verdict as I read it your verdict?

Juror: Yes.

CDC: [Juror Number Six], is the verdict as I read it your verdict?

Juror: Yes.

CDC: [Juror Number Seven], is the verdict as I read it your verdict?

Juror: Yes.

CDC: [Juror Number Eight], is the verdict as I read it your verdict?

Juror: Yes.

CDC: [Juror Number Nine], is the verdict as I read it your verdict?

Juror: Yes.

CDC: [Juror Number Ten], is the verdict as I read it your verdict?

Juror: Yes.

CDC: [Juror Number Eleven], is the verdict as I read it your verdict?

Juror: Yes.

CDC: [Juror Number Twelve], is the verdict as I read it your verdict?

Juror: Yes.

Court: Thank you, folks. Please be seated. Thank you, Mr. Marshal. You [individuals in the gallery section of the court room] are free to leave, folks. Thank you. Just let them out Mr. Marshal. That's quite all right.

At this time, I am going to thank you, excuse you and discharge you. Before I do so, there are a couple of comments that I wanted to make.

First, I wanted to thank each of you for your time, patience, labor and considerable efforts in connection with this case.

I said at the outset of the case when the jury was selected that jury service is a very, very difficult, but critically important task to be called upon to play. Indeed, in my view, there is perhaps no higher task that an American can be called upon to play than to serve as a juror in one of our courts. The right to trial by jury, in my view, is the single most important, the single most indispensable element of our criminal justice system, without which our criminal justice system simply would not function. And so I wanted to tell you that. And, indeed, I say that, ladies and gentlemen of the jury, whenever a jury returns, regardless of what the verdict may be, in a criminal case. It is that critical to have the right to trial by jury in our system.

Having said that, I very much appreciate your patience and your efforts. I will ask you to leave in the jury room all of the exhibits and materials. The Marshal will secure them so they are available for court process as we proceed down the road. And when you go back into the jury room on your way out, the Marshal will assist you in finding your way to your transportation and to your homes.

You are free at this point to discuss or not discuss this case as the spirit moves you individually. With that, I thank you all, folks, for your time, labors and patience.

*Id.* at 7–10.

The procedure of polling all the jurors specifically and individually is to reinforce the message of unanimity in the jury's decision as building from each juror's individual decision as to the guilt or innocence of the defendants. It is worth stressing that at no point during or after the entire polling session did any of the jurors say anything other than affirmatively respond when asked as to the accuracy of the verdict nor did counsel for the Defendants request a juror to repeat his or her affirmance of the stated verdict or object to any response given by a juror during the polling process.

We believe that the procedural steps taken by this Court in receiving the verdict, as detailed above, provided extensive opportunity for any of the jurors to express disagreement as to the unanimity of the verdict. None did. Given the procedural safeguards provided in this matter as to receiving the verdict, we are reluctant to further step into the realm of the jury's deliberations and thought processes either as to juror number four's agreement with the verdict or juror number four's alleged absence from the jury room when in the bathroom at some point during deliberations.[4]

As to the circumstances under which juror number four expressed her agreement with the verdict, the procedural protections provided in receiving the verdict were more than adequate to ensure that jurors number one, two, or four could express any disagreement with the verdict that was reached. At no point during or after the receipt of the verdict, including the taking of the verdict, the polling of the jurors, or the final instructions to jurors, did any of the jurors express their disagreement with the unanimity of the verdict. Although the official court transcript indicates clearly that juror number four unambiguously stated her agreement with the verdict by saying "yes," even by her own account she made a noise—"S"—sounding

---

4. The Supreme Court likewise observed in *Tanner* numerous general procedural safeguards concerning the reliability of a verdict:

Petitioners' Sixth Amendment interests in an unimpaired jury … are protected by several aspects of the trial process. The suitability of an individual for the responsibility of jury service, of course, is examined during *voir dire.* Moreover, during the trial the jury is observable by the court, by counsel, and by court personnel. *See United States v. Provenzano,* 620 F.2d 985, 996–997 (CA3 1980) (marshal discovered sequestered juror smoking marijuana during early morning hours). Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict. [citation omitted]. Finally, after the trial a party may seek to impeach the verdict by nonjuror evidence of misconduct. *See United States v. Taliaferro,* 558 F.2d 724, 725–726 (CA4 1977) (court considered records of club where jurors dined, and testimony of marshal who accompanied jurors, to determine whether jurors were intoxicated during deliberations).

*Tanner,* 483 U.S. at 127, 107 S.Ct. at 2751.

like "yes," which objectively indicated that she agreed with the verdict. That juror number four had "no" on the tip of her tongue or that other jurors would have been willing to express disagreement as to unanimity if another juror had disagreed all goes not only to the internal workings of the deliberative process but even further to the inner workings of the mind. To allow subsequent claims of an apparent willingness—not objectively expressed—to vote for a different verdict if asked a second time to form the basis of a ruling allowing interviews of members of the jury would plainly eviscerate Rule 606(b)'s requirement of an *external* influence on the jury. Nor can this form the basis for setting aside the jury's verdict, ordering a new trial and starting over.

As to the possible "bathroom" absence of juror four at a certain time during the deliberations, we are constrained to conclude that such behavior falls squarely within the scope of Rule 606(b) and its policy considerations against revisiting the internal workings of the jury process. The Supreme Court's decision in *Tanner* is worth returning to in this regard. As detailed earlier, in that case there were allegations of jurors actually falling asleep during various proceedings and being under the influence of alcohol and narcotics. Yet, in large part based upon the powerful policy considerations against stepping into the realm of how the jury reached its verdict, the Supreme Court affirmed the district court's decision not to permit interviews of members of the jury in that case. The Court favorably cited to the following congressional statement concerning the balancing necessary to ensure the Defendant's right to a fair trial under the Sixth Amendment against policy considerations concerning the deliberative process:

> Public policy requires a finality to litigation. And common fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation. In the interest of protecting the jury system and the citizens who make it work, rule 606 should

not permit any inquiry into the internal deliberation of the jurors.

*Tanner*, 483 U.S. at 124–25, 107 S.Ct. at 2750 (citing S.Rep. No. 93–1277, 93rd Cong., 2d Sess. (1974)). The Supreme Court further observed these sound reasons against admission of jury testimony to impeach a verdict:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

*Tanner*, 483 U.S. at 119–20, 107 S.Ct. at 2747 (quoting *McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915)).

In short, the text of Rule 606(b) works together with the policy considerations provided by Congress and the federal courts to limit the scope of review to an extent that we are constrained to conclude here that we cannot revisit and examine this deliberative process further. Accordingly, we conclude that the statements concerning the location of jurors during deliberation and the unexpressed thoughts and inclinations of individual jurors during the polling process plainly are at the heart of the jury's deliberative process and cannot form the grounds for this Court to allow interviews of the jurors to take place.

### 4.

█ Finally, we turn from what until now has been a discussion of statements contained in the affidavits of juror number one and juror number two and the letter received from juror number four, to the joint motion of the Defendants Watson, Veal, and Haynes, which motion contains further statements as

to possible juror misconduct. The following excerpt from the joint motion is the only support that the three Defendants put forth for granting them leave to interview members of the jury:

> ... On Monday morning, June 27, [1994,] one of the jury members was waiting for Roy Kahn, Esq., attorney for Nathaniel Veal, when he arrived at this office. The juror related to Mr. Kahn her distress that the verdict was based on an influence outside the record evidence. The juror indicated that the verdict did not reflect her assessment of the record evidence, was influenced by an outside source, and expressed a belief that numerous other members of the jury were similarly situated. Shortly after this conversation, a second juror telephoned Mr. Kahn and reiterated these sentiments.

Joint Mot. for Leave to Interview, pp. 1–2. From this excerpt, the three Defendants maintain that counsel "has a good faith belief that the verdict in this case was affected by an extrinsic influence which improperly influenced the deliberative process." *Id.* at 1.

Although counsel may have a good faith belief of an extrinsic influence, a good faith belief does not satisfy the requirement in *Cuthel*—counsel must present a substantial and specific showing of an extrinsic influence. Stating that such an extrinsic influence was at work here—without *any* specifics or evidentiary support to back up the statement— is so speculative in nature as to necessitate the conclusion that Defendants may not be given leave to interview the members of the jury. Were Defendants successful in their attempt to obtain leave from this Court to interview the jurors based upon the conclusory, speculative statements contained in the joint motion, we are constrained to conclude that almost any request for leave to interview jurors would have to be granted. This was not the intent of the drafters of Rule 606(b) and we decline to grant leave to the Defendants based upon so scant an evidentiary foundation as is offered here.

### III.

The various post-verdict statements by jurors and the statements contained in the Defendants' motions raise questions as to the deliberative process that took place in this case. The interests that the Court must carefully consider in such a situation are clear: a defendant's right under the Sixth Amendment of the Constitution to a fair trial must be weighed against the dangers of never reaching finality in a case and intruding into the most sensitive deliberations of the jury which are kept private to encourage the candid debate necessary to carry out the all-important task of reaching a just verdict. In an attempt to balance these conflicting interests, Congress has crafted, and the federal courts interpreted, Rule 606(b) of the Federal Rules of Evidence so as to require a substantial and specific showing of an extrinsic influence upon the jury deliberation process. Defendants in this case have failed to carry their burden to show that an impermissible extrinsic influence affected the deliberations.

Accordingly, it is hereby

ORDERED and ADJUDGED that (1) Defendant Pablo Camacho's Preliminary Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial, is DENIED; and (2) Defendants Andy Watson, Nathaniel Veal, and Charlie Haynes's Joint Motion for Leave to Interview Members of the Jury is DENIED. Furthermore, it is hereby ORDERED that the Clerk of the Court shall keep the letter received from juror number four under SEAL [5] pursuant to the terms of this Court's Sealing Order of July 6, 1994, such that it be made available for appellate review.

DONE AND ORDERED.

---

5. The sealing Order shall remain in effect except to the extent that specific reference to certain comments in the letter have been disclosed in this Order.